**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARGRETE IMPERATO,**

       **Plaintiff,**

**v.**                                   **3:13-cv-1594 (BKS/DEP)**


**OTSEGO COUNTY SHERIFF'S DEPARTMENT,**
**SHERIFF RICHARD DEVLIN, Jr., LIEUTENANT**
**DONALD LINCOURT, individually and in their**
**official capacities, LIEUTENANT ADAM**
**PIERCE, SERGEANT ADAM TILBE, and SERGEANT**
**MICHAEL ELLWANGER,[1]**

       **Defendants.**
_____

**Appearances:**
For Plaintiff
**Brian W. Matula**
Cooper Erving & Savage LLP
39 North Pearl Street
Albany, New York 12207

For Defendants
**William J. Hathaway**
The Law Firm of Frank W. Miller
6575 Kirkville Road
East Syracuse, New York 13057

---

[1] The Court has addressed Defendants' argument that Pierce, Tilbe, and Ellwanger are not parties to this case *infra* in section IV(F)(1).

**Hon. Brenda K. Sannes, United States District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Margrete Imperato[2] filed this action on December 30, 2013, alleging causes of action for (1) discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); (2) retaliation in violation of Title VII; (3) violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; (4) discrimination in violation of New York Executive Law § 296 (also known as the New York Human Rights Law, or "NYSHRL"); (5) retaliation in violation of New York Executive Law § 296 ("NYSHRL"); (6) violation of Article 1, § 11 of the New York State Constitution; and (7) intentional infliction of emotional distress. (Dkt. No. 1). Defendants Otsego County Sheriff's Department ("OCSD"), Sheriff Richard Devlin, Jr., and Lieutenant Donald Lincourt filed a motion for summary judgment on March 5, 2015, and Defendants Adam Pierce, Adam Tilbe, and Michael Ellwanger filed a separate motion for summary judgment on April 22, 2015. (Dkt. Nos. 19, 26).[3] For the reasons that follow, the motion filed by Defendants Pierce,

---

[2] Plaintiff was formerly known as Margrete Barnhart, and is referred to by that name in some parts of the record. (Dkt. No. 19-15, ¶ 1; Dkt. No. 22-1, ¶ 1).

[3] Defendants Pierce, Tilbe, and Ellwanger were not listed in the caption of the complaint. (Dkt. No. 1, p. 1). Defendants OCSD, Devlin, and Lincourt filed for summary judgment on March 5, 2015. (Dkt. No. 19). On March 31, 2015, counsel for Defendants filed a motion for leave to file a summary judgment motion out of time on behalf of Pierce, Tilbe, and Ellwanger. (Dkt. No. 24, p. 1). Counsel submitted an affidavit asserting that Pierce, Tilbe, and Ellwanger had not been served with summonses in this matter, and that Plaintiff never moved to amend the complaint to include those three individuals as defendants. (Dkt. No. 24-1, p. 2). Defendants' counsel argued that Pierce, Tilbe, and Ellwanger were not parties to this action, but requested that if the Court deemed that they were defendants, that they be given leave to file a motion for summary judgment. (*Id.*, p. 3). The Court granted that motion on April 1, 2015 (Dkt. No. 25), and Defendants Pierce, Tilbe, and Ellwanger filed a motion for summary judgment on April 22, 2015. (Dkt. No. 26). The Court addresses their status as defendants *infra*.

Tilbe and Ellwanger is granted and the motion filed by the remaining defendants is granted in part and denied in part.

## II.    BACKGROUND

### A.    Facts[4]

Plaintiff began her employment at OCSD in June 2008. (Dkt. No. 19-15, ¶ 5; Dkt. No. 22-1; ¶ 5). She was hired as a part-time corrections officer. (Dkt. No. 19-15, ¶ 6; Dkt. No. 22-1; ¶ 6). When Plaintiff was hired, she underwent New York State Peace Officer Certification Training. (Dkt. No. 19-15, ¶ 8; Dkt. No. 22-1; ¶ 8). As part of that training, Plaintiff "was required to qualify with a firearm and she did so." (Dkt. No. 19-15, ¶ 9; Dkt. No. 22-1; ¶ 9). Plaintiff completed the training program in Spring 2009 and received a New York State Peace Officer Certification. (Dkt. No. 19-15, ¶ 10; Dkt. No. 22-1; ¶ 10). She was assigned regular duties as a part-time corrections officer in the Otsego County Correctional Facility. (Dkt. No. 19-15, ¶ 11; Dkt. No. 22-1, ¶ 11). "On June 9, 2009, [her] probationary term ended and [she] was appointed on [a] permanent basis." (Dkt. No. 22, p. 2).

Defendant Devlin is the Sheriff of Otsego County. (Dkt. No. 19-6, p. 1). He was the Chief Commanding Officer of OCSD at all relevant times. (Dkt. No. 1, p. 3; Dkt. No. 7, p. 2). Defendants Lincourt and Pierce were commanding officers of the OCSD Correctional Facility. (Dkt. No. 1, pp. 3-4; Dkt. No. 7, pp. 2-3). Defendants Tilbe and Ellwanger were part of the supervisory staff at OCSD. (Dkt. No. 1, pp. 4-5; Dkt. No. 7, p. 3).

---

[4] The facts are taken from the parties' stipulated facts (Dkt. Nos. 19-15, 22-1) and the exhibits attached to Defendants' motion for summary judgment (Dkt. No. 19), as well as Plaintiff's affidavit in opposition to the motion for summary judgment and the exhibits attached thereto (Dkt. No. 22). The Court has also cited to the EEOC Final Determination and Department of Justice Notice of Right to Sue attached to Plaintiff's complaint (Dkt. No. 1-1, pp. 1-5). The Court has construed all facts in the light most favorable to Plaintiff, as the non-moving party in a motion for summary judgment. *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

### 1.      Full-Time and Part-Time Corrections Officers

At the time Plaintiff was hired, there were two full-time female corrections officers in OCSD. (Dkt. No. 19-15, ¶ 15; Dkt. No. 22-1; ¶ 15). As of October 19, 2010, there were seven part-time female corrections officers, including Plaintiff. (Dkt. No. 19-15, ¶ 16; Dkt. No. 22-1, ¶ 16). Plaintiff alleges that in 2010 and 2011 all of the part-time corrections officers were female. (Dkt. No. 22, p. 3). When she was hired, Plaintiff was told that she could submit an application for full-time employment when a full-time position became available. (Dkt. No. 19-15, ¶ 17; Dkt. No. 22-1, ¶ 17).

Plaintiff alleges that "[p]art time employees did not receive pay for vacation, holiday or sick time or allowed [sic] to participate in specialized details. Full time employees enjoyed greater benefits and professional opportunities." (*Id.*). She also states: "In order to advance to higher ranks, there was a prerequisite that an employee had to serve as a full time corrections officer for at least three years – thereby precluding advancement in ranks by the part-time officers." (*Id.*). She alleges: "During my employment, the part-time female officers never received an hour meal break despite working upwards of 40 hours per week with overtime.[5] The full-time corrections officers received a one-hour break every day." (*Id.*).

Plaintiff states that "[t]he female corrections officers did not have a restroom they could access during the day without securing coverage from other officers. On numerous occasions, I was forced to go the entire shift without being able to use the restroom. The male officers did not have such issues." (Dkt. No. 22, p. 3).

---

[5] Plaintiff states that she "worked approximately 72 hours per two-week pay period," as well as "considerable amounts of overtime." (Dkt. No. 22, p. 1).

## 2.     May 2009 Complaint and Investigation

Plaintiff alleges that she "first began complaining of sexual harassment and discrimination in the Sheriff's Department" during her "probationary period." (Dkt. No. 22, p. 1). On May 24, 2009, she sent an email to Defendant Devlin in which she wrote:

> Sheriff Devlin,
>      I'm at a loss here. I love my job but I have no where [sic] to go. Problems within the jail are occurring everyday ranging from bullying, harassment, sexual harassment and sexual discrimination. Unfortunately I'm not the only individual who feels this way. It seems that no matter how I try to resolve these problems internally, [it's] as though I'm not getting the help I need. I would like to know who we can go to [sic] resolve these problems.

(Dkt. No. 22, p. 17).

An OCSD document, on Defendant Devlin's letterhead, states that, on May 24, 2009, Devlin "[r]eceive[d] email from CO Barnhart stating she was having problems in the jail that included bullying, harassment, sexual harassment and sexual discrimination." (*Id.*, pp. 2, 19). He "assigned Undersheriff Allison to meet with Barnhart and address her concerns." (*Id.*). On May 26, 2009,

> Undersheriff Allison reports that he met with Barnhart and most of her concerns were personality issues with other staff. There were comments made by Sgt. Butler that bothered Barnhart and were unprofessional. Sgt. Butler was interviewed by Undersheriff Allison and counseled.
>
> Undersheriff spoke to other female employees in jail and no other information was developed.
>
> There appears to be no further action needed and Supervisory staff was spoken to regarding being professional with staff and monitoring [] their employees.

(*Id.*). Plaintiff alleges that she "met with Under Sheriff Allison and another employee, Angel Robinson who was also experiencing discrimination, to discuss this matter. [She] advised Mr.

5

Allison that [she] could not use the chain of command because of the involvement of [her] immediate supervisors." (*Id.*, p. 2).

### 3. September 2009 Discrimination Complaint by Female Corrections Officer Angel Robinson

In opposition to Defendants' motion for summary judgment, Plaintiff submitted a sworn statement by Corrections Officer Angel Robinson on an "Otsego County Correctional Facility Write-Up" form complaining about an incident that took place on September 22, 2009. (Dkt. No. 22, p. 75). Robinson states that she had been called "up front" to update Sgt. Butler regarding an inmate. (*Id.*). When she asked to speak with Butler, she "heard C/O Clark tell Sgt. Butler it's your girlfriend." (*Id.*). She complained about the comment to Butler, who told Clark "to knock it off." (*Id.*). Robinson then heard Clark say "tell her to fuck off." (*Id.*) Robinson did not feel "that Sgt. Butler was taking [her] seriously," and after her "next rounds," she "went up front" to discuss the situation. (*Id.*). She asked Butler "to write up C/O Clark for what he said," and threatened to go "straight to the Sheriff" if he did not report the incident. (*Id.*). Later, Butler told her "that he had written up C/O Clark." (*Id.*). He subsequently told her "that he informed both the UnderSheriff [sic] and the Sheriff about the matter." (*Id.*).

### 4. April 2010 Complaint to County Personnel Officer

On April 2, 2010, Plaintiff contacted County Personnel Officer Jennie Gliha via email "concerning issues which [she] believed to be sexual harassment and discrimination." (Dkt. No. 22, pp. 3-4). Plaintiff sent emails to Gliha, outlining various problems at OCSD. (*See id.*, pp. 20-25). In an email to Gliha dated April 7, she wrote regarding the failure to provide female corrections officers with a relieved break. (*Id.*, p. 21). Plaintiff informed Gliha of an email she received that day from Defendant Lincourt stating:

All supervisors and Part Time Staff;
Part time female section staff may lock in their inmates and come out for breaks
periodically during their shift.
This has not changed.
This does not mean they can miss rounds or special watch checks.

(*Id.*, p. 21). Plaintiff wrote to Gliha:

I feel that the administrations [sic] decision is not in the best interest for the
facility or the female officers. . . .
I have been informed that the State Commission of Corrections are allowing us
(female officers) to lock in the inmates, so we can leave our post. In my eyes this
puts the facility[ ]& officer at the mercy of the state when an inmate decides to
take matters into their own hands when we leave.
. . .
When we[ ](the female officers) leave our post we are endangering the inmates
because our post now becomes unmanned, unsupervised[ ](no cameras), and
unsafe. . . . I'm not looking to cause problems for anyone but simply wish for the
female officers to have a relieved break. I don't wish to see the jail or any
personal [sic] within the jail become victim to a lawsuit.

(*Id.*).

In an email to Gliha dated April 23, 2010, Plaintiff wrote regarding an incident that

allegedly took place on May 20, 2009:

At approximately 1245 I had arrived early to relieve officer Robinson in the
female section. I was gathering all my necessary paper work so I could relieve her
on time; when Lt Lincourt approached the glass window looking into the central
post and stated "Hey Barnboots". He then proceeded to state that I'm a
disgruntled employee and I haven't ["]said more than 2 words to anyone lately."
Approximately half an hour later Lt. Lincourt called me in the female section and
stated that "He needed to speak with me." I then proceeded to his office. When I
approached his office I could see that Lt Lincourt was there as well as Lt Pierce. I
sat down and Lt Lincourt stated that he didn't mean anything by what he said to
me and he was sorry if I had offended you. I wasn't in a particularly good mood
considering this is what I dealt with as soon as I got to work. I stated that I didn't
appreciate being called barnboots or the fact that I'm a disgruntled employee in
their eyes.

Both Lt's then were questioning me as to why I haven't said more than 2 words to
anyone lately. I informed them that I had nothing to talk about, and that I would

rather not discuss it. Both Lt Lincourt and Lt Pierce stated that "I was treating them like shit" and kept asking whether there was "some kind of conspiracy going on". I stated no. Lt Pierce then stated "I can't fix what I don't know". Mind you that I didn't want to discuss anything at all with them but they [persistently] continued to badger me.

Then I finally stated that the scheduling was one of the many problems that had arisen in the past couple weeks. The biggest problem was the fact that Sgt Kehoe was the Sgt designated to make the female schedules for each month. I informed both Lt's that I had a serious problem with the fact that Sgt Kehoe was still being allowed to make the schedules up, even after his girlfriend started working here. To me this was a conflict of interest that Sgt Kehoe be allowed to make her schedule. Lt Pierce responded by stating "Sgt Kehoe has yet to make up a schedule on his own yet, and that as far as I'm concerned it's bullshit" .

Lt Lincourt then stated that "I'm not going to apologize for the scheduling, I've tried my best" "I almost picked up the phone and boarded all of the females out". Lt Pierce then asked me if I was interested in the cross training that was taking place. I simply stated that I had a second job at the time and I wasn't interested. He then proceeded to ask if I would be interested in the fall, and I said I wouldn't know it was too far away.

I would simply like the demeaning and bullying to stop between the administration and the Correction officer staff. In the near future I would like to be able to feel comfortable enough to speak with the Lieutenants without feeling as if I am awaiting a trial of conviction. I also understand that better communication and relationships are a two way street, so I will improve any wrongs or misunderstandings on my part. We are all human and make mistakes, I just hope that somehow this can be resolved.

(Dkt. No. 22, p. 23). In an undated email to Gliha, Plaintiff complained about the "cross-training" requirement, which required part-time female staff to be trained to work on the male side, but did not require part-time males to work on the female side. (Dkt. No. 22, p. 24). She also complained that "[a]ll part time female staff have never received an hour meal break." (*Id.*, p. 25). Plaintiff said that "the part time males and full time female/males receive a 1 hour break typically halfway through there [sic] shift everyday [sic]." (*Id.*). Plaintiff told Gliha that under the Otsego DBA Contract, "[a]ll employees shall be entitled to a one-half (1/2) hour lunch period

which may be taken at any time during the employee's regular work shift, such time to be considered as time worked." (*Id.*).

### 5. April 2010 Counseling for Improper Shift Turnover

On April 22, 2010, the Personnel Director contacted Devlin and reported that Plaintiff had contacted her "on more than one occasion regarding departmental issues." (Dkt. No. 22, p. 30). The next day Defendant Tilbe issued Plaintiff an "informal counseling & conduct review form" for "conduct[ing] [a] shift change with CO Ferris and fail[ing] to complete a proper shift turnover by not completing a proper head count of inmates housed in [her] unit." (Dkt. No. 22, pp. 27-28).

### 6. Counseling for Complaints to Gliha

On April 26, 2010, Devlin issued a "Letter of Counseling Memorandum" to Plaintiff regarding her contact with Gliha. (*See id.*; Dkt. No, 19-6, ¶ 22; Dkt. No. 19-11, p. 2). Devlin informed Plaintiff that she should have addressed her concerns "within this office using your chain of command." (*Id.*). He stated that the "failure to use your chain of command is a direct violation of Section 7003.4 of the Otsego County Correctional Facility Policy and Procedures." (*Id.*). Devlin wrote that had he known of the issues Plaintiff reported, he would have "taken corrective action, if needed, to address your concerns," and that:

> Any further incidents of your failure to follow the chain of command could result in departmental charges being filed against you for insubordination or misconduct.
> I would request that you identify your concerns to me in a written memorandum so that I can address them with supervisory staff. I would be more than willing to meet with you to discuss my findings.
> You need to sign and return this memorandum. No formal charges will be filed against you, however a copy will be placed in your personnel file. Once returned a copy will be forwarded to you for your records.

(*Id.*). Although Defendants assert that Devlin's request that Plaintiff address concerns to those within her chain of command was not disciplinary, Plaintiff maintains that she "did interpret the second paragraph of the letter to be disciplinary," pointing to the threat of departmental charges for future failures to comply with the request. (Dkt. No 19-15, ¶ 35; Dkt. No. 22-1, ¶ 35).

Plaintiff alleges that she received Devlin's memorandum on May 9, 2010, and that she "interpreted this letter to be punishment in response to [her] complaint of sexual discrimination." (Dkt. No. 22, p. 4). The same day, Plaintiff wrote Devlin a letter in response, stating that she had "tried to utilize the chain of command" when she complained about sexual discrimination, bullying and harassment on May 24, 2009, but had "not been able to resolve the issues at hand." (*Id.*, pp. 31-32). She noted that during the investigation of that complaint she had told Undersheriff Allison that she "could not utilize the chain of command due to the department personnel involved." (*Id.* at 31). She wrote: "I do not feel I have rights anymore at my place of work, and also feel like anything I do I will be counseled for. If my issues and concerns were respected by the Chain of Command Officials when I first came forward with these problems it would have stayed in-house as you and I would have liked it to." (*Id.*, p. 32).

Reporting complaints of discrimination to the County Personnel Officer is permitted under both of the discrimination and harassment policies attached to Defendant Devlin's affidavit in support of this motion. (Dkt. No. 19-6, pp. 1-2; Dkt. No. 19-7, pp. 3, 6).[6]

---

[6] The OCSD policy and procedural manual on sexual harassment states that "any employee who believes that another employee is initiating sexual harassment may file a written complaint with Jennie Gliha, Personnel Officer, Otsego County Personnel Office." (Dkt. No. 19-7, p. 3). The County of Otsego policy "recommends that the employee confront the harasser directly;" notes that if the incident "cannot be resolved directly between the parties involved, a written or verbal complaint should be filed . . . with the employee's immediate supervisor," and "[i]n the event the employee does not believe it would be appropriate to file the complaint with the immediate supervisor, it

### 7. Hiring of Full-Time Corrections Officers in 2010

Defendant Devlin states that in May 2010, a notice was posted for a full-time corrections officer position. (Dkt. No. 19-6, ¶ 7). In response, Devlin received two applications: one from female part-time corrections officer Angel Robinson, and one from male part-time corrections officer Ros Devlin. (*Id.*, ¶ 8). He explained: "At that time the female applicant was having attendance issues and the male had perfect attendance and was recommended for the position by the supervisory staff. Therefore he was selected for the position." (*Id.*, ¶ 9). In her affidavit, Plaintiff asserts that "[a]t the time that Ros Devlin was hired as a full time corrections officer, he had not passed the civil service examination – something that was required for promotion to the full time position." (Dkt. No. 22, p. 11).[7]

Later in 2010, OSCD offered Robinson a full-time corrections officer position. (Dkt. No. 19-15, ¶ 19; Dkt. No. 22-1, ¶ 19). Robinson declined the full-time position in September 2010 for personal reasons. (Dkt. No. 19-10; *see also* Dkt. No. 19-15, ¶ 19; Dkt. No. 22-1, ¶ 19).

### 8. December 2010 Evaluation

Defendant Tilbe issued a performance evaluation to Plaintiff dated December 13, 2010. (Dkt. No. 22, p. 34). The evaluation stated that Plaintiff's "overall performance [was] satisfactory," and she received ratings of either "satisfactory" or "improving" in individual categories throughout the evaluation. (*Id.*, pp. 34-36). The evaluation also contained comments

---

may be filed directly to the appropriate Department Head or to the County's Personnel Officer." (Dkt. No. 19-7, p. 6).

[7] Plaintiff also states that it is her "understanding . . . that the female candidate had in fact passed the required civil service examination and was more qualified." (*Id.*). Plaintiff does, however, not cite to any evidence in support of her "understanding." Rule 56(c)(4) requires that affidavits used to oppose a motion for summary judgment be based "on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that [she] is competent to testify on the matters stated," as required by Fed. R. Civ. P. 56(c)(4). The Court, therefore, declines to consider Plaintiff's assertion.

stating that Plaintiff did not have "a positive outlook," that she "need[ed] to work on her negative attitude and working relationship with others," and that she "need[ed] to change her attitude to become a better officer." (*Id.*, pp. 34. 36). According to Plaintiff, when she met with Defendant Tilbe regarding her evaluation on December 16, 2010, he told her "on multiple occasions that she did not have a 'positive outlook' and needed to work on her 'negative attitude.'" (*Id.*, p. 4).

### 9.  Letter from Union Representative

On February 15, 2011, a representative of Teamsters Local Union No. 693, which represented the part-time corrections officers under Defendant Devlin's supervision, wrote to Devlin regarding alleged "serious, immediate issues" at OCSD. (Dkt. No. 22, p. 87). The letter stated in part:

> Virtually every aspect of the unit members' employment is poisoned with one form or another of harassment and discrimination. By what is clearly no coincidence, every member of the bargaining unit is female, and each is constantly being subjected to conditions which, when compared to what is offered the full-time, almost exclusively male corrections officers, are so lacking as to be shocking.

> First, the unit members must work in inferior facilities. By way of example, there is no dedicated restroom. They are subject to significant safety issues, such as they do not receive adequate relief to allow for breaks, nor do they receive proper backup when faced with dangerous situations caused by inmates.

> They are routinely overlooked when full-time positions are being filled. They are routinely subjected to verbal harassment or ridicule based upon gender or position.

> In short, the unit members under your supervision are subject to a pervasive hostile environment based upon their gender, that bears upon every aspect of their job.

(*Id.*, pp. 87-88).

## 10. Removal of Microwave and Coffee Maker

On February 19, 2011, Defendant Tilbe sent an email to Defendants Pierce and Lincourt, in which he reported that Plaintiff and another Corrections Officer, Susan Szczepanski, had "been heating up a wet wash cloth in the microwave for Inmate Schneider and her medical issue with her chin." (Dkt. No. 22, p. 40). He stated:

> I have informed [the nurse] Lynn of this who became furious at the fact that some Female CO's think they are Dr.'s and do what they want for the inmates down there. I find this to be a big safety issue as that could easily burn the inmate. At this time I will be issuing disciplinary actions for both of them and removing the microwave and coffee maker from the female section as apparently they can not use them appropriately.

(*Id.*). Plaintiff stated in her affidavit: "This would never have been done in response to actions of a male employee. How this could possibly have been considered a safety issue causing burns – when I was personally handling the washcloth – is beyond comprehension." (*Id.*, p. 6).

## 11. Counseling for Leaving Post

On July 25, 2011 Defendant Ellwanger issued a "counseling memo" to Plaintiff, on an "Informal Counseling & Conduct Review Form" for leaving her post without notifying her supervisor. (Dkt. No. 19-15, ¶¶ 38-39; Dkt. No. 22-1, ¶¶ 38-39). According to the memo, Plaintiff "left her post to respond to an incident and didn't notify a supervisor that an incident had/was occurring." (Dkt. No. 22, p. 42). It is undisputed that Plaintiff did not lose any pay, was not suspended and did not lose any benefits as a result of that counseling and conduct review form. (Dkt. No. 19-15, ¶ 42; Dkt. No. 22-1, ¶ 42).

### 12.     Complaint Regarding Conduct at Firearm Requalification

Plaintiff participated in a "re-qualification for firearm use" on September 15, 2011. (Dkt. No. 22, p. 6). She alleges that "training officers administering the training and qualification were using disparaging language." (*Id.*). Plaintiff did not requalify for use of a handgun. (Dkt. No. 19-15, ¶ 43; Dkt. No. 22-1, ¶ 43).

Plaintiff wrote to Defendant Devlin on September 18, 2011 reporting the "[u]nprofessional [c]onduct" she perceived at the range. (Dkt. No. 22, p. 45). She reported that "certain officers of both corrections and road patrol" had made comments during the training including: "'He moves like a cat'[;] 'You're a queer and a fagot'; 'You're a fat fuck'; 'Im [sic] going to ride him like a rodeo'; [and] 'We are going to make Imperato cry.'" (*Id.*). She complained about a Deputy's remarks and inquiries "concerning classes that both females were attending." (*Id.*). Plaintiff stated that she felt that her inability to qualify "was due to the lack of help and constant remarks." (*Id.*). Defendant Devlin stated in his affidavit that upon receiving Plaintiff's email, he "immediately assigned Undersheriff Allison to investigate the matter and as a result of that investigation an officer was found to have used inappropriate language and was counseled." (Dkt. No. 19-6, ¶ 26).

Because Plaintiff did not requalify for use of a firearm in September 2011, she "could not carry a department issued handgun." (Dkt. No. 19-15, ¶ 44; Dkt. No. 22-1, ¶ 44).

### 13.     Counseling for Unauthorized Shift Swap

On October 9, 2011, Defendant Ellwanger issued an "informal counseling & conduct review form" to Plaintiff regarding the "unauthorized swapping of shifts." (Dkt. No. 19-9, p. 2). Plaintiff violated department policy by failing to obtain proper approval of all supervisors for a

shift swap with another officer. (Dkt. No. 19-15, ¶ 40; Dkt. No. 22-1, ¶ 40). In her affidavit,

Plaintiff states that: "Prior to this counseling memorandum, I had previously sought guidance

about the facility's shift swapping policy and was advised that there were no restrictions on the

number of swaps for part time officers." (Dkt. No. 22, p. 7; *see also id.*, p. 54). She

acknowledges that she failed to obtain the supervisors' signature on the form, but states that the

swapping of shifts "occurred frequently and on many occasions were not formally documented

in advance." (Dkt. No. 22, p. 7, 11). Plaintiff states that she had never before been counseled for

swapping shifts. (Dkt. No. 22, p. 11). It is undisputed that Plaintiff did not lose any pay, was not

suspended and did not lose any benefits as a result of that counseling and conduct review form.

(Dkt. No. 19-15, ¶ 42; Dkt. No. 22-1, ¶ 42).

### 14. Refusal to Participate in Inmate Transport

On October 13, 2011, Plaintiff was ordered to accompany another corrections officer to

transport an inmate to the hospital. (Dkt. No. 19-15, ¶ 45; Dkt. No. 22-1, ¶ 45). The officer who

Plaintiff was to accompany on the inmate transport was armed. (Dkt. No. 19-15, ¶ 47; Dkt. No.

22-1, ¶ 47). Plaintiff refused the order, and another officer was assigned to go in her place. (Dkt.

No. 19-15, ¶ 48; Dkt. No. 22-1, ¶ 48). Plaintiff states that before this incident, on October 5,

2011, her name had been "crossed off the list" for an armed transport, and Defendant Ellwanger

had advised her that this "was because [she] could not conduct armed assignments." (Dkt. No.

22, p. 7). She further explained:

> On October 13, 2011, I was scheduled for a meeting with Defendants
> Lincourt and Pierce concerning the shift-swapping counseling memorandum.
> During that meeting, I asked why, on October 5, 2011 I was not permitted to carry
> out a transport. I was advised that the matter was "above my paygrade" and that
> the meeting was not intended to address that issue.

On October 13, 2011, I was advised that I was scheduled to perform a transport.

I advised Defendant Tilbe that I was told I could not perform transports. Defendant Tilbe was in the meeting wherein I was told that this issue was "above my paygrade." I also told him that Sargent [sic] Ellwanger had previously told me that I could not perform those transports. The policies in place at the time required that where there were conflicting orders, and the employee brought that to the superior's attention, that it was the superior officer's responsibility to resolve the conflict with the officer issuing the first order. Defendant Tilbe failed to act according to the policy addressing conflicting orders.

(*Id.*, pp. 7-8).

Plaintiff submitted a copy of OCSD's policy and procedure manual section 7003.7, which states that "[a]ll inmate transports will be armed when possible." (*Id.*, p. 56). The policy does not state whether, when multiple officers are assigned to a transport, each officer should be armed. (*Id.*, pp. 56-57). It is undisputed that "[a]ccording to departmental policy, if one officer on an inmate transfer is armed, the second officer is not required to be armed." (Dkt. No. 19-15, ¶ 46; Dkt. No. 22-1, ¶ 46). Plaintiff asserts, however, that "the policy dictates that officers should be armed *when possible*." (Dkt. No. 22-1, ¶ 46) (emphasis added). Defendant Devlin alleges that "[d]ue to the limited number of firearms available to the department, it is very common that only one of the officers on a transport is armed," and that Plaintiff had previously "carried out several transport assignments where only one officer was armed." (Dkt. No. 19-16, ¶¶ 30-31). Plaintiff asserts that in this instance "there was nothing preventing another armed officer from performing the transport." (Dkt. No. 22-1, ¶ 46).

## 15.    Suspension

On October 17, 2011, Devlin issued a memorandum to Plaintiff notifying her that she was being charged with misconduct based on her refusal of the transport assignment. (Dkt. No.

22, p. 63). In the memorandum, Devlin explained the charge as follows: "On October 13, 2011, you disobeyed a lawful order by refusing to go on an emergency medical transport to the hospital. . . . Your failure to follow orders and procedures caused unnecessarily [sic] delay in the transport of an inmate to the hospital jeopardizing the care and welfare of the inmate." (*Id.*). Devlin further stated that Plaintiff was "immediately suspended from active duty pending an administrative hearing." (*Id.*). On October 26, 2011, he issued a revised notice of discipline, in which he explained that Plaintiff's "refusal constitute[d] insubordination and a violation of the Policy and Procedure of the Office of the Otsego County Sheriff, Sections 712.2, Section 12." (*Id.*, p. 65). He informed Plaintiff: "[I]t is the intention of the County and the County Sheriff to seek the penalty of dismissal from service." (*Id.*, p. 66). Plaintiff was placed on suspension without pay pending a hearing under section 75 of the New York State Civil Service Law ("section 75"). (Dkt. No. 19-15, ¶ 50; Dkt. No. 22-1, ¶ 50; Dkt. No. 19-6).

### 16. Application for Full-Time Corrections Officer Position

On December 2, 2011, while Plaintiff was suspended and awaiting a disciplinary hearing, Defendant Devlin issued a memorandum stating: "There may be a Full Time Correctional Officer position in the immediate future. Any Part time officer who is interested in this position needs to submit a written memorandum prior to December 13, 2011 for consideration." (Dkt. No. 22, p. 70). Plaintiff submitted a memorandum to Devlin on December 12, 2011 asking that she be considered for the position. (*Id.*, p. 71). Plaintiff asserts that she "was fully qualified for the

position," but that she "was not hired." (Dkt. No. 22, p. 9). There is no evidence in the record regarding who, if anyone, was appointed to this position.[8]

### 17. Section 75 Hearing and Termination

On December 13 and 14, 2011, a section 75 hearing was held, presided over by hearing officer John Trela, "an experienced professional arbitrator." (Dkt. No. 19-15, ¶ 52; Dkt. No. 22-1, ¶ 52; Dkt. No. 19-6, p. 4). Plaintiff was represented by an attorney at the hearing, and the parties agree that she had a full and fair opportunity to present her case: "Plaintiff testified and explained the background facts and circumstances relating to her refusal to go on the armed transport." (Dkt. No. 19-15, ¶¶ 53-55; Dkt. No. 22-1, ¶¶ 53-55). The OCSD argued that the only appropriate remedy was termination. (Dkt. No. 19-13, p. 15).

On February 16, 2012, Hearing Officer Trela issued an opinion and recommendation based on the evidence at the hearing, as well as written submissions from the parties following the hearing. (Dkt. No. 19-13, p. 2). He determined that "the County of Otsego Sheriff's Department has met its burden of proof based on substantial and convincing evidence in the record" and found Plaintiff guilty of the charge of misconduct. (*Id.*, p. 22). He recommended "that the penalty to be imposed is termination, because of the very serious nature of this infraction and that the Employer has lost its trust in the Respondent to hold the position of a Corrections Officer." (*Id.*, p. 26). Plaintiff did not challenge the hearing officer's findings or decision "under Article 78 or by any other means." (Dkt. No. 19-15, ¶ 58; Dkt. No. 22-1, ¶ 58).

On February 22, 2012, Defendant Devlin wrote to Plaintiff explaining that it was his "determination to adopt the findings and recommendations of Mr. Trela, in full." (Dkt. No. 19-

---

[8] The Court notes that in a sworn affidavit Susan Szczepanski states that she was offered a full-time position in mid-January 2012. (Dkt. No. 22, p. 78). The record does not indicate whether this is the same position.

14, p. 2). He therefore found Plaintiff guilty of insubordination and "determined that the appropriate penalty [was] termination . . . effective immediately." (*Id.*).

### 18. Allegations of Susan Szczepanski

Plaintiff filed a complaint alleging discrimination with the EEOC on February 8, 2012 (prior to the hearing officer's issuance of his opinion and recommendation). (Dkt. No. 19-15, ¶ 68; Dkt. No. 22-1, ¶ 68). She submitted a sworn affidavit from Susan Szczepanski, dated April 18, 2012, in connection with the EEOC matter and has filed Szczepanski's affidavit in opposition to Defendants' motion for summary judgment. (Dkt. No. 22, pp. 76-78). In her affidavit, Szczepanski stated that she was hired as a part-time corrections officer in 2009 and that not only did a "sexist attitude permeate[] the facility," but that she had "been repeatedly subject to sexual discrimination" during her employment. (*Id.*, p. 77). According to Szczepanski, in December 2009 she was told that she was "lucky that you are a female because if you were a male this would have been settled in the locker room." (*Id.*). She further stated that: "Male Corrections Officers have told me 'you're a girl, you're not good enough,' as well as making other comments that are sexist involving my lack of qualification to be a Corrections Officer specifically because I am female." (*Id.*). She also stated that in March 2012, a male corrections officer told a coworker that he was going to "'punch [her] in the face,'" and that when she complained to Sgt. Ellwander about this threat, nothing was done. (*Id.*). She further stated that "[f]emales were never actively hired as full-time Corrections Officers by Otsego," and that in 2012 she believed that all of the full-time officers with one exception were men. (*Id.*).

Szczepanski stated that she had applied for a full-time position in 2010 that was given to a male applicant who had a lower score on the civil service exam than she did. (*Id.*, pp. 77-78).

Szczepanski stated she was "finally hired into a full-time position" in January 2012. (*Id.*, p. 78.).

Szczepanski stated that when Lt. Pierce offered her the position:

> He insisted that he needed to know "now" whether I would take the position. I found his insistence to be very odd. The previous, male corrections officer fulltime hire was given a couple of days to determine whether he would accept a new position, which requires some consideration. I am aware that Margrete Imperato filed a charge of employment discrimination with the EEOC in December 2011[9] that challenges the discriminatory practices of Otsego not hiring females into full time Corrections Officers positions. Notably, it was not until January 2012 that I was for the very first time offered or acknowledged for a full time Corrections Officer position.

(*Id.*). Szczepanski further asserted that the County had hired four more part-time corrections officers, all of whom were female, and that the County was currently hiring a new full time corrections officer but that she was unaware of any posting for the position. (*Id.*). Szczepanski stated: "I find it strange that none of the female employees who have just been hired as part time Corrections Officers were given the full time Corrections Officer position that is being filled." (*Id.*).[10]

### 19. Alleged Treatment of Male Employees

In her affidavit, Plaintiff describes various incidents under the heading "No actions taken against male officers." (Dkt. No. 22, p. 9). She submitted a memorandum from the Otsego County Sheriff's Office which shows that on November 20, 2011, Ros Devlin was charged with misconduct for having "used unnecessary force in waking an inmate for his medications by rolling him out of his bunk and onto the floor" and failing "to document this incident as a

---

[9] Plaintiff filed an EEOC complaint on February 8, 2012. (Dkt. No. 19-15, ¶ 68; Dkt. No. 22-1, ¶ 68). Although plaintiff alleges in the unverified complaint that she filed a complaint with the EEOC in December 2011 (Dkt. No. 1, ¶ 50), there is nothing in the record regarding such a complaint.
[10] On April 24, 2014, Szczepanski filed a complaint in the Northern District of New York, alleging that she was terminated on December 9, 2012, in retaliation for participating in Plaintiff's EEOC proceedings. *See Szczepanski v. Otsego Cnty. Sheriff's Dep't, et al.*, Case Number 3:14-cv-475(LEK/DEP).

medication refusal." (*Id.*, p. 80). Although the record does not reflect what, if any, discipline was imposed for this incident, OCSD records reflect that Ros Devlin was still employed as a corrections officer for Sheriff Devlin on December 4, 2011. (*Id.*, p. 81).

Plaintiff also submitted a request for disciplinary action from Defendant Lincourt to Defendant Devlin dated July 27, 2011, "requesting disciplinary action for CO Coffin not to exceed loss of two (2) accrued vacation and or holiday leave days," for "the charge of insubordination as defined by OCCF Policy and Procedure Manual: Rules of Conduct." (*Id.*, p. 84). Defendant Lincourt attached a memorandum from Sergeant Ellwanger to the request, stating that he that he had "instructed all staff to follow Policy and Procedure regarding keep lock and administrative segregation housing and not to do any 'favors' for the inmates and give them things they are not directly entitled to," and later "observed CO Coffin personally retrieving Inmate Willey hot water in order for him to make some coffee . . . in direct violation of the order." (*Id.*). When confronted with this discrepancy in the punishment recommended for Plaintiff's insubordination and for Officer Coffin's insubordination at Plaintiff's section 75 hearing, OCSD argued that "the difference is that in the other case [of insubordination], the officer was truthful when confronted about his actions [sic] was able to recognize the need to avoid any such insubordination in the future." (Dkt. No. 19-13, p. 14).[11]

### B.      Procedural History

On February 8, 2012 Plaintiff filed a charge of employment discrimination with the

---

[11] The Court is not considering information Plaintiff has provided regarding discipline of another officer, Michael Clarke, and other information provided regarding Ros Devlin's involvement in an off-duty incident (*see* Dkt. No. 22, pp. 9-10), because there is no indication that Plaintiff's information is based "on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that [she] is competent to testify on the matters stated," as required by Fed. R. Civ. P. 56(c)(4).

EEOC. (Dkt. No. 19-15, ¶ 68; Dkt. No. 22-1, ¶ 68). The EEOC issued a Final Determination on

May 14, 2013, concluding that there was reasonable cause to believe that OCSD discriminated

against Plaintiff. (Dkt. No. 1-1, pp. 2-3).[12] The Department of Justice decided not to bring an

action, and issued Plaintiff a Notice of Right to Sue letter on September 30, 2013. (Dkt. No. 1-1,

p. 5). On December 30, 2013, plaintiff commenced this action. (Dkt. No. 1).

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if

all the submissions taken together "show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of

material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see*

---

[12] In its Final Determination the EEOC stated:

> EEOC is unable to conclude that Respondent has a pattern or practice in denying females full-time
> corrections officer position [sic]. Likewise, EEOC is unable to conclude that Respondent
> subjected Charging Party to conduct that was so severe and pervasive that had [sic] the purpose
> and effect of altering her work environment. . . .
> However, the evidence obtained by the EEOC showed that Respondent's defenses as to why
> Charging Party was issued disciplinary actions and why her work hours were reduced are not
> credible and a pretext. For instance, Respondent said Charging Party's hours were reduced in 2011
> due to budgetary reasons but hired several full-time correction officers in early 2012. Thus,
> Charging Party was more likely than not subjected to different terms and conditions of
> employment and adverse employment actions because of her participation in or opposition of a
> legally protected activity that is enforced by the EEOC.
> Based on the above, Respondent's asserted defense does not withstand scrutiny and the
> Commission has determined that there is reasonable cause to believe that Respondent has
> discriminated against Charging Party.

(Dkt. No. 1-1, pp. 2-3). The EEOC's determination does not have preclusive effect in this case. *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 369-70 (S.D.N.Y. 2006).

*also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting

*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## IV.    DISCUSSION

### A.    Preliminary Issues

#### 1.    Issue Preclusion Regarding the Insubordination Charge

As an initial matter, Defendants argue that the hearing officer's determination following Plaintiff's section 75 hearing (*see* Dkt. No. 19-13) collaterally estops Plaintiff from challenging the finding of insubordination or from arguing that her termination was a pretext for retaliation. (Dkt. No. 20, pp. 16-17; Dkt. No. 23, p. 10). "State law governs the preclusive effects in federal court of a state administrative agency's quasi-judicial findings." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 45 (2d Cir. 2014). "'New York courts give quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate.'" *Id.* (quoting *Burkybile v. Bd. of Educ. of Hastings–On–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005)). Moreover, the Second Circuit has held that "[t]his rule applies to findings made by administrative officers after conducting section 75 hearings." *Id.* (citing *In re Cheeseboro*, 84 A.D.3d 1635, 1636, 923 N.Y.S.2d 772, 773 (3d Dep't 2011)).

In *Matusick*, the Second Circuit instructed:

Like a prior judicial finding of fact, in order to have preclusive effect over a subsequent fact-finding or legal analysis, a prior administrative determination must have resolved the identical issue, and the issue must have been actually and finally decided in the prior adjudication. But even if an identical issue was necessarily decided in the prior proceeding, issue preclusion does not apply unless there was a full and fair opportunity for the party against whom preclusion is sought to contest the decision now said to be controlling.

*Id.* (internal quotation marks, alterations, and citations omitted). In this case, Devlin adopted the hearing officer's opinion and recommendation and terminated Plaintiff's employment. (Dkt. No. 19-6, p. 4). Thus, it became the official decision of OCSD. *See Matusick*, 757 F.3d at 46 (finding that because the county agency adopted the recommendations of the hearing officer after a section 75 hearing, "that recommendation became the official decision of the agency").

Next, the Court must consider whether the issues decided by the hearing officer are identical to issues Plaintiff has raised in this case "and therefore preclusive of issues that must be decided in order to resolve this dispute." *Id.* at 47. Following the section 75 hearing, the hearing officer concluded that OCSD met its burden of proving "by substantial and convincing evidence" that Plaintiff was "guilty of Misconduct/Insubordination." Dkt. No. 19-13, p. 26. There is no indication, however, that the hearing officer received evidence that OCSD's charge of misconduct and insubordination was "motivated, even in part, by an intent to discriminate" or retaliate,[13] "which [are] at the heart of the" claims in the present action. *Matusick*, 757 F.3d at 48. (noting also that there was no "indication that if the hearing officer had heard this evidence, it would have been within his statutorily defined authority to review that allegation"). Thus, the hearing officer's factual determination is not identical to the issues present in this motion for summary judgment. *Id.*

The hearing officer did, however, make factual findings on an issue which is contested in this case: he found that Plaintiff was guilty of misconduct/insubordination because she refused an order "to go on an emergency medical transport of an inmate." (Dkt. No. 19-13, p. 22). Thus,

---

[13] Although the hearing officer heard evidence regarding discipline imposed on another officer accused of insubordination, he considered that evidence in determining whether the penalty of termination was justified. (Dkt. No. 19-13, p. 24). There is no indication that it was argued or the hearing officer considered whether the difference in treatment was due to gender or in any way retaliatory.

the Court must address "what the preclusive effects" of this finding are. *Matusick*, 757 F.3d at

48. "Critical to the resolution of the question is the determination of whether the 'issue' that is

identical in the two proceedings involves a factual or legal determination." *Id.* Because the

"section 75 framework differs substantially from the legal framework for state and federal

employment discrimination law," the hearing officer's conclusions would not preclude Plaintiff's

argument that she was suspended and terminated "in substantial part" as a result of

discrimination or retaliation. *Id.* The hearing officer's factual findings—that Plaintiff "refused

Sgt. Tilbe's October 13, 2011 order to go on an emergency medical transport of an inmate" and

"that her refusal . . . was not justified or excused"—are, however, "of a different nature" and

preclude Plaintiff from arguing, as relevant here, that her refusal was justified or excused. *See id*.

("The *factual findings* supporting the hearing officer's ultimate conclusion—that Matusick had

indeed committed the charged conduct, *i.e.*, that he had failed to respond to calls and slept on

duty—are of a different nature. These findings precluded Matusick from arguing otherwise at

trial.").

Thus, Plaintiff is precluded from arguing that she did not engage in

"misconduct/insubordination" or that her refusal of the order to go on an armed transport was

justified. This does not, however, preclude Plaintiff from arguing that she "was also" suspended

and terminated "at least in part because" of discrimination or retaliation. *Id*. at 47; *see also Senno

v. Elmsford Union Free Sch. Dist*., 812 F. Supp. 2d 454, 472 (S.D.N.Y. 2011) ("[A] finding that

[p]laintiff was terminated for cause does not bar [p]laintiff's Title VII claim. Even if [p]laintiff

cannot dispute the factual findings of the Hearing Officer's decision, [p]laintiff can still prevail if

he shows that [d]efendants acted with an improper motive in bringing charges against [p]laintiff.").

## 2. Statute of Limitations

Defendants argue that Defendant Devlin's April 26, 2010 counseling letter cannot be considered as part of her Title VII claim because she did not file her complaint with the EEOC until February 2012, which is beyond the 300 day time limit that applies to Title VII. (Dkt. No. 20, p. 14). Defendants also argue that "because Plaintiff did not file her Complaint commencing this action until December 30, 2013, any claim she might have presented under the New York Human Rights Law in connection with the April 26, 2010 counseling memorandum is time-barred because such claims are subject to a three-year statute of limitations." (*Id.*). Thus, the Court must consider whether Plaintiff's claims are time-barred.

"A plaintiff seeking to bring claims pursuant to Title VII must file a complaint with the EEOC or equivalent state agency within 300 days of the challenged conduct." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 204 (E.D.N.Y. 2014) (citing 42 U.S.C. § 2000e-5(e)(1)); *see Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Vega*, 801 F.3d at 79. Because Plaintiff filed her EEOC complaint on February 8, 2012 (Dkt. No. 19-15, ¶ 68; Dkt. No. 22-1, ¶ 68), alleged incidents of discrimination and retaliation that occurred before April 14, 2011 are time-barred. 42 U.S.C. § 2000e-5(e)(1). In addition, under New York Human Rights Law, Plaintiff's claims are subject to a three year statute of limitations. *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007)

(citing N.Y. Exec. Law § 296; N.Y. C.P.L.R. § 214(2)). Thus, Plaintiff cannot recover under New York Human Rights Law for any adverse action that occurred prior to December 30, 2010.

Under both Title VII and the NYSHRL, Plaintiff cannot rely on the "informal counseling & conduct review form" that Defendant Tilbe issued to Plaintiff on April 23, 2010 and the counseling letter Defendant Devlin issued to Plaintiff on April 26, 2010 as adverse employment actions because they are time-barred. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002) ("Each discrete discriminatory act starts a new clock for filing charges alleging that act."). Likewise, the performance evaluation that was issued to Plaintiff on December 13, 2010 (Dkt. No. 22, p. 34) falls outside the limitations period for both the Title VII claim and the New York Human Rights Law claim. *See* 42 U.S.C. § 2000e-5(e)(1).

The statute of limitations does not, however, "bar an employee from using . . . prior acts as background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113; *see Anderson v. Nassau Cnty. Dep't of Corr.*, 558 F. Supp.2d 283, 299 (E.D.N.Y. 2008). Thus, the Court may consider conduct outside the statute of limitations as evidence supporting an inference of discrimination for Plaintiff's Title VII and NYSHRL claims.

## B. Discrimination Claims

Discrimination claims under Title VII are generally evaluated under the *McDonnell Douglas* burden-shifting analysis. *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).[14] First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *St.*

---

[14] Employment discrimination claims brought under the NYSHRL are analyzed under the same standards that apply to Title VII discrimination claims. *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n.3, 786 N.Y.S.2d 382 (2004).

*Mary's Honor Ctr.*, 509 U.S. at 506. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (internal citations omitted). The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *St. Mary's Honor Ctr.*, 509 U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42. (internal citations, quotation marks, and punctuation omitted).

### 1. Prima Facie Case – Suspension and Termination

To establish a prima facie case of employment discrimination under Title VII, Plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 497 (E.D.N.Y. 2012) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 491-92 (2d Cir. 2009)); *see also N.Y. State Office of Mental Health v. N.Y. State Div. of Human Rights*,

210 A.D.2d 686, 687, 619 N.Y.S.2d 874, 876 (N.Y. App. Div. 3d Dep't 1994). The fourth prong

of this test may be satisfied either by "(1) direct evidence of discriminatory intent, or (2) a

showing by the Plaintiff that [s]he was subjected to disparate treatment compared to persons

similarly situated in all material respects to [her]self." *Bennett*, 842 F. Supp. 2d at 497 (internal

citations, quotation marks and punctuation omitted). Plaintiff has established the first two prongs

of her prima facie case. It is undisputed that she is a member of a protected class and that she

was qualified for her position.

### 2.    Adverse Employment Action

Plaintiff asserts, and Defendants do not dispute, that the unpaid suspension and the

termination of her employment are adverse actions.[15] Plaintiff further alleges, however, that

Defendants' issuance of counseling memoranda constitute adverse actions. Plaintiff argues that

the question of whether the issuance of counseling memoranda "constitute adverse employment

actions is a question of fact left to consideration by a jury." (Dkt. No. 22-2, p. 6).

An adverse employment action is "a materially adverse change in the terms and

conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir.

2004). "'A materially adverse change might be indicated by a termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices unique to a particular

situation.'" *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v.*

---

[15] Plaintiff's suspension without pay was an adverse employment action, *Lovejoy Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001); *Collazo v. Cnty. of Suffolk*, __ F. Supp. 3d __, No. 12-CV-2196(JS)(GRB), 2016 WL 660856, at *9, 2016 U.S. Dist. LEXIS 18907, at *31 (E.D.N.Y. Feb. 17, 2016), as was her termination. *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).). Rejection of Plaintiff's application for the full-time corrections officer position in December 2011 was also an adverse employment action. *See Harrison v. U.S. Postal Serv.*, 450 F. App'x 38, 40-41 (2d Cir. 2011); *Glaser v. Fulton Montgomery Cmty. Coll.*, 50 F. App'x 17, 20 (2d Cir. 2002). The Court discusses Plaintiff's failure to promote claim separately. *See* section IV(B)(2).

*Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)) (internal punctuation omitted).

In *Uddin v. City of New York*, in discussing whether, *inter alia*, counseling or reprimands constitute adverse actions, the court noted:

> Reprimands and excessive scrutiny of an employee can contribute to a finding that an adverse employment action has taken place. "However, courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." In other words, being advised and counseled does not, as a matter of law, constitute an adverse employment action.

*Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (quoting *Honey v. Cnty of Rockland*, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002)); *see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002); *Weeks v. New York State*, 273 F.3d 76, 86 (2d Cir. 2001)).

Here, Plaintiff has presented no evidence indicating that she suffered any negative results because of the counseling memoranda she received on July 25, 2011 and October 9, 2011. (Dkt. No. 22, p. 42; Dkt. No. 19-9, p. 2). The parties agree that Plaintiff "did not lose any pay, was not suspended and did not lose any benefits as a result of" those two counseling memoranda. (Dkt. No. 19-15, ¶ 2; Dkt. No. 22-1, ¶ 42). Nevertheless, citing *Wilson v. Grand Cent. Partnership, Inc.*, No. 03 Civ. 1299(VM), 2004 WL 1367489, at *7, 2004 U.S. Dist. LEXIS 11051, at *20 (S.D.N.Y. June 16, 2004), Plaintiff argues that there is an issue of fact as to whether the counseling memoranda constituted adverse employment actions because the counseling memoranda "put the Plaintiff on notice that future conduct would place the Plaintiff in jeopardy for more severe discipline." (Dkt. No. 22-2, p. 7). Plaintiff has, however, failed to cite to any language in the counseling memoranda or any evidence in the record to support this claim. This

case is therefore unlike *Wilson*, where the court found an issue of fact regarding whether counseling memoranda constituted an adverse action based on the language in one memorandum which placed the plaintiff "on notice" that he may be subject to "more severe penalties" if improvement did not occur, and another memorandum which "suggest[ed] that a subsequent incident will result in more severe discipline." 2004 WL 1367489, at *7, 2004 U.S. Dist. LEXIS 11051, at *20. There is no such language here, and thus Plaintiff has failed to raise a triable issue of fact regarding whether the counseling memoranda are adverse employment actions. *See Williams v. N.Y.C. Housing Auth.*, 335 F. App'x 108, 110 (2d Cir. 2009) (holding that issuance of two counseling memoranda did not constitute an adverse employment action); *Weeks*, 273 F.3d at 86 (holding that a "notice of discipline" and a "counseling memo" were not adverse employment actions where the plaintiff did not describe their "effect or ramifications, how or why the effect would be serious," or whether the documents went into any file or were in writing); *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 307 (E.D.N.Y. 2014) ("[E]ven if Plaintiff is correct that the counseling memorandum was unjustified, such a counseling memorandum, standing alone, does not constitute an adverse employment action.") (citations omitted); *Lyman v. NYS OASAS*, 928 F. Supp. 2d 509, 520 (N.D.N.Y. 2013) ("[T]he issuance of a 'counseling memorandum' and a 'notice of discipline,' without any further evidence regarding a materially adverse effect thereof, is not an adverse employment action as a matter of law.").

### 3.    Circumstances Giving Rise to Inference of Discrimination

As stated above, this prong of the prima facie test can be satisfied either by "(1) direct evidence of discriminatory intent, or (2) a showing by the Plaintiff that [s]he was subjected to disparate treatment compared to persons similarly situated in all material respects to [her]self."

32

*Bennett*, 842 F. Supp. 2d at 497. "Inference of discrimination 'is a flexible standard that can be satisfied differently in differing factual scenarios.'" *Barella v. Vill. of Freeport*, 16 F. Supp. 3d 144, 162 (E.D.N.Y. Apr. 26, 2014) (quoting *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011)). "An inference of discrimination can be drawn from circumstances such as 'the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the . . . adverse employment action.'" *Id.* (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)) (internal punctuation omitted). "Showing an employer's motivation to discriminate is 'usually' accomplished through the 'cumulative weight of circumstantial evidence.'" *United States v. City of New York*, 713 F. Supp. 2d 300, 322 (S.D.N.Y. 2010) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).

A plaintiff can also raise an inference of discrimination "by showing that the employer subjected [her] to disparate treatment, that is, treated [her] less favorably than a similarly situated individual outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* Thus, a court must determine whether a plaintiff has "adduced enough evidence to support a finding" that the plaintiff and the comparators were sufficiently similarly situated to support an inference of discrimination. *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). Here, Plaintiff has submitted evidence which raises a triable issue of fact regarding whether there was disparate treatment in the punishments she received for insubordination

(suspension without pay and with the intent to seek dismissal, followed by termination), as compared to male corrections officers. (Dkt. No. 22, pp. 9-10).

In order to show that she is similarly situated to others outside the protected group, Plaintiff must show that she is "similarly situated" in all "material respects" to those with whom she compares herself. *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001). "In other words, where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Id.* at 54. "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010) (quoting *Graham*, 230 F.3d at 40) (internal citation and punctuation omitted). Plaintiff need not show that she and her comparators were in "identical" situations; rather, she must show "a reasonably close resemblance of the facts and circumstances" between her case and her comparators' cases. *Id.*

Although Plaintiff has not specifically alleged that the male officers in question were subject to the same performance evaluation and discipline standards as she was, the record indicates that Ros Devlin and Officer Coffin were both employed as corrections officers at OCSD under Defendant Devlin's authority. (Dkt. No. 22, pp. 80, 84). An organizational chart Plaintiff submitted shows that all corrections officers worked under Devlin and the lieutenants and sergeants. (*Id.*, p. 15). Further, Ros Devlin was charged with misconduct and subject to the penalties under section 75 of New York Civil Service Law (*id.*, p. 80), like Plaintiff (Dkt. No.

34

19-13, p. 4). Plaintiff submitted OCSD documents showing that Officer Coffin disobeyed an order, as she did, and that Defendant Lincourt requested disciplinary action "for the charge of insubordination as defined by OCCF Policy and Procedure Manual." (Dkt. No. 22, p. 84). Viewing the facts in the light most favorable to Plaintiff, there is a triable issue of fact regarding whether Plaintiff is "similarly situated" to the male corrections officers she identified in terms of disciplinary standards.

OCSD records show that Defendant Lincourt requested that the disciplinary action for Officer Coffin's insubordination not "exceed loss of two (2) accrued vacation and or holiday leave days." (*Id.*). The hearing officer at Plaintiff's article 75 proceeding noted that: "[a] recent other incident of a refusal of an order only resulted in the imposition of the loss of two vacation days and a letter of reprimand." (Dkt. No. 19-13, p. 14). Although Plaintiff's insubordination was more serious, there is a triable issue of fact regarding whether she received disparate and much harsher treatment than was accorded to Coffin. Further, the evidence that Ros Devlin was still working at the OCSD after he was charged with "misconduct" for having rolled an inmate "out of his bunk and onto the floor" could support that inference. (*Id.*, pp. 80-81). Thus, given Plaintiff's minimal burden at the prima facie stage, she has raised a triable issue of fact regarding whether she received disparate treatment as compared to the male corrections officers. *See Ruiz*, 609 F.3d at 494. *See also Villar v. City of New York*, __ F. Supp. 3d __, 2015 WL 5707125, at *10, 2015 U.S. Dist. LEXIS 131633, at *32 (S.D.N.Y. Sept. 29, 2015) (holding that the plaintiff "established that her termination occurred under circumstances giving rise to an inference of sex-based discrimination" where the "record contain[ed] evidence that a male lieutenant subject to

the same performance and evaluation standards engaged in conduct comparable to Plaintiff's but received a far less harsh penalty").

### 4.        Prima Facie Case – Failure to Promote

Plaintiff's failure to promote claim is based on the denial of her application for a full-time position in December 2011. To establish a prima facie case for a discrimination claim based on failure to promote, "a plaintiff must show that (1) she is a member of a protected class, (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was not selected for the position, and (4) that the failure to promote occurred under circumstances giving rise to an inference of discriminatory intent." *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 266 (E.D.N.Y. 2013). The fourth element of the test "may be established by evidence that the position was filled by an individual who was not a member of the plaintiff's protected class or that the position remained open and the defendant continued to seek a candidate with [the] plaintiff's qualifications." *Id.* at 271 (internal quotations marks and citations omitted). *See also Brown v. Coach Stores*, 163 F.3d 706, 709 (2d Cir. 1998). Plaintiff has established the first three prongs: she was a member of a protected class; she applied and was qualified for the position of full-time corrections officer; and she was rejected for the position. (Dkt. No. 22, pp. 8-9). However, Plaintiff has not submitted evidence establishing that the position remained open after she was rejected, or that it went to a male officer. *See Blake v. Bronx Lebanon Hosp. Ctr.*, No. 02 Civ. 3827(DAB), 2007 WL 2981465, at *8, 2007 U.S. Dist. LEXIS 75770, at *22 (S.D.N.Y. Oct. 10, 2007). Plaintiff has not provided any information at all regarding whether the position was filled, and if so, by whom. There is thus insufficient evidence

36

to infer discriminatory intent, and Plaintiff has failed to establish a prima facie case on her failure to promote claim.

### 5.    Non-Discriminatory Reason for Adverse Employment Actions

As plaintiff has established a *prima facie* case of discrimination with respect to her immediate suspension without pay and termination, a presumption of discrimination arises, and the burden shifts to Defendants to demonstrate some legitimate, non-discriminatory reason for the adverse decision or action. *McDonnell Douglas Corp*., 411 U.S. at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). Defendants have satisfied that burden. Defendants have submitted evidence that Plaintiff's immediate suspension and termination were based on a legitimate, non-discriminatory reason – Plaintiff's insubordination in failing to follow an order to participate in an armed transport. (Dkt. No. 19-6, pp. 3-4; *see also* Dkt. No. 19-12, p. 1; Dkt. No. 19-13, p. 26). Therefore the burden returns to Plaintiff to establish that these reasons were a pretext for discrimination. *Weinstock*, 224 F.3d at 42.

### 6.    Pretext

Plaintiff's burden at the third stage of the *McDonnell Douglas* burden-shifting analysis is to produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42. (internal citations, quotation marks, and punctuation omitted). For purposes of Plaintiff's discrimination claim, "[s]o-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med.*

*Ctr. v. Nassar*, __ U.S. __, 133 S.Ct. 2517, 2523 (2013). As discussed above, Plaintiff has raised

a triable issue of fact regarding whether the harsh punishments she faced for her insubordination,

immediate suspension without pay followed by termination, reflected disparate treatment, as

compared to more lenient punishments for male officers. *See Graham*, 230 F.3d at 43. Thus,

Defendants' motion for summary judgment as to Plaintiff's discrimination claims is denied.

### C.    Retaliation Claims

Like Plaintiff's discrimination claims, her retaliation claims must be analyzed under the

*McDonnell Douglas* burden-shifting framework. *Bennett*, 842 F. Supp. 2d at 499; *Davis-Bell v.*

*Columbia Univ.*, 851 F. Supp. 2d 650, 681 (S.D.N.Y. 2012). Plaintiff must first establish a prima

facie case of retaliation. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013); *Forrest v.*

*Jewish Guild for the Blind*, 3 N.Y.3d 295, 312-13, 786 N.Y.S.2d 382 (2004). If Plaintiff

establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate,

non-retaliatory reason existed for its action. *Summa*, 708 F.3d at 129 (citing *Raniola v. Bratton*,

243 F.3d 610, 625 (2d Cir. 2001)). If the employer demonstrates a legitimate, non-retaliatory

reason for the adverse employment action, the burden shifts back to the employee to establish

that the employer's action was caused by retaliatory motive, using a "but-for" causation

standard. *Nassar*, 133 S.Ct. at 2534.

### 1.    Prima Facie Case

The four prongs of a prima facie case of retaliation are: (1) that Plaintiff engaged in

protected activity; (2) OCSD was aware of the activity; (3) OCSD took adverse employment

action against Plaintiff; and (4) a causal connection between the protected activity and the

adverse employment action. *Summa*, 708 F.3d at 125; *Forrest*, 3 N.Y.3d at 312-13.

Plaintiff has established the first two prongs of her prima facie case. Defendants do not dispute, for purposes of summary judgment, that Plaintiff engaged in protected activity and that Defendants were aware of that activity. (Dkt. No. 20, pp. 13-15). There is evidence that Plaintiff engaged in protected activity when she made internal complaints regarding perceived gender discrimination or harassment on May 24, 2009, (Dkt. No. 22, p. 17), April 2, 7, and 23, 2010 (*id.*, pp. 3-4, 20-25), September 18, 2011 (*id.*, p. 45), and when she filed an EEOC complaint on February 8, 2012 (Dkt. No. 19-15, ¶ 68; Dkt. No. 22-1, ¶ 68). Thus, the Court will evaluate the third and fourth prongs of the prima facie test in turn.

### a. Adverse Employment Action

The definition of "adverse employment action" in the retaliation context is "not limited to discrimination actions that affect the terms and conditions of employment," but rather covers harms that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006) (citation and internal quotation marks omitted). Under this standard, "[m]aterial adversity is to be determined objectively based on the reactions of a reasonable employee." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012).

Plaintiff claims that the July 25, 2011 and October 9, 2011 counseling memoranda, her suspension, Defendants' failure to promote her, and her termination all constitute adverse employment actions. (Dkt. No. 22-2, pp. 5-8). Plaintiff has adduced sufficient evidence from which a jury could find that these counseling memoranda constitute adverse employment actions for purposes of Plaintiff's retaliation claims. *See Kercado-Clymer v. City of Amsterdam*, 370 F. App'x 238, 242 (2d Cir. 2010) ("A reasonable trier of fact could find that the counseling

memorandum, disciplinary charges, loss of accrued vacation, and ban from desk duty could all dissuade a reasonable worker from making or supporting a charge of discrimination."); *Johnson v. Nicholson*, No. 05 CV 2740(JMA), 2007 WL 1395546, at *5-6, 2007 U.S. Dist. LEXIS 34782, at *14-16 (E.D.N.Y. May 11, 2007) (holding that actions including issuance of written counseling memoranda constituted adverse employment actions for purposes of retaliation "under the broader standard of *Burlington Northern*"). Furthermore, Plaintiff's immediate suspension, the denial of her application for a full-time position, and her termination all constitute adverse employment actions for purposes of the retaliation claims, as they were materially adverse changes to Plaintiff's employment, and thus would have been sufficient to dissuade a reasonable employee from making a claim of discrimination. *See supra* section IV(B)(2).[16]

### b. Causal Connection

Close temporal proximity between a protected activity and an adverse employment action may be sufficient to establish, for the purposes of the prima facie test, "the requisite causal connection between a protected activity and a retaliatory action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010); *see also Al Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010). While there is no bright-line rule for what interval of time may help to establish a

---

[16] Plaintiff also appears to argue that Defendant Tilbe's removal of the coffee pot and the microwave from the female section of the facility in February 2011 is an adverse employment action, noting that it took place just four days after a union representative had written to Defendant Devlin complaining of discrimination and harassment. (Dkt. No. 22-2, p. 9). This event is time-barred under Title VII, but falls within the limitations period for the NYSHRL and § 1983 claims. This may be sufficient to constitute an adverse action for the purposes of an NYSHRL retaliation claim. *See, e.g.,Vega*, 801 F.3d at 91. The parties, however, have not addressed whether a letter written by a union representative on behalf of Plaintiff's union constitutes protected activity by the Plaintiff. In light of the parties' failure to brief the issue and in light of the ruling that Plaintiff's retaliation claim survives as to other adverse actions, the Court does not rule on whether the removal of the coffee maker and microwave constitutes an adverse action.

causal relationship, "temporal proximity cannot support an inference of causal connection unless the retaliatory action and the protected activity were 'very close' in time." *Perry v. NSARC, Inc.*, 424 F. App'x 23, 26 (2d Cir. 2011) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). Proof of causal connection can also be established "by evidence of disparate treatment of fellow similarly situated employees, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *Blanco v. Brogan*, 620 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2009) (citing *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986); *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)).

Here, there is a close temporal proximity between Plaintiff's protected activity on September 18, 2011 (Dkt. No. 11, p. 45) and two adverse employment actions that occurred less than a month later: (1) the counseling memorandum issued to Plaintiff on October 9, 2011[17] for the "unauthorized swapping of shifts" (Dkt. No. 19-9, p. 2); and (2) Plaintiff's immediate suspension without pay on October 17, 2011 (Dkt. No. 22, p. 63), which is sufficient to satisfy her *de minimis* burden of adducing evidence of a causal connection. *See, e.g., Zann Kwan*, 737 F.3d at 845 ("The three-week period from Kwan's complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."). With respect to Plaintiff's termination, Defendant OCSD notified Plaintiff within this same time frame, on October 26, 2011, that it intended to seek termination. (Dkt. No. 19-12, p. 3). Also, there is a close temporal proximity between Plaintiff's filing of an EEOC complaint on February 8, 2012 (Dkt. No. 19-15, ¶ 68; Dkt. No. 22-1, ¶ 68) and Plaintiff's termination on February 22,

---

[17] The counseling memorandum that was issued to Plaintiff on July 25, 2011 is not in close temporal proximity to any of Plaintiff's protected activities, and Plaintiff has not offered any other evidence of a causal connection between that memorandum and her participation in protected activities. Thus, it cannot form the basis for a retaliation claim.

2012 (Dkt. No. 19-14, p. 2). In addition, there is a close enough temporal proximity between Plaintiff's complaint to Defendant Devlin on September 18, 2011 and the denial of Plaintiff's application for a full-time position in December 2011 (Dkt. No. 22, p. 9) to infer causation. *See, e.g., Raneri v. McCarey*, 712 F. Supp. 2d 271, 280 (S.D.N.Y. 2010) ("In this instance, the failure to promote Raneri five months after the lodging of her complaint could lead a reasonable jury to conclude that retaliation played some part in the decision, notwithstanding the invitation which was extended to all technicians to apply at that time."); *Demoret v. Zegarelli*, 361 F. Supp. 2d 193, 204 (S.D.N.Y. Mar. 4, 2005), *rev'd in non-pertinent part*, 451 F.3d 140 (2d Cir. 2006) ("[S]ix months between the filing of the instant lawsuit and the termination is sufficiently suggestive of a causal relationship."); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (noting that "[t]hough this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship").

### 2.    Legitimate, Non-Retaliatory Reasons

As stated above, Defendants have produced a legitimate, non-discriminatory reason for Plaintiff's suspension and termination, as well as the denial of her application for a full-time position. *See supra* section IV(A)(5). They have also produced a legitimate, non-discriminatory reason for the counseling memorandum: Plaintiff's swapping of shifts without prior approval. *See id.*

### 3.    Pretext

Under the *McDonnell Douglas* framework, if the defendant provides a non-retaliatory reason for their employment actions, that reason overcomes the presumption of retaliation created by the plaintiff's prima facie case. *Zann Kwan*, 737 F.3d at 845. The defendant is then entitled to summary judgment unless the plaintiff comes forward with evidence showing that the "non-retaliatory reason is a mere pretext for retaliation," *id.*, and that the plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 133 S.Ct. at 2534; *see also Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 246-47 (E.D.N.Y. 2014) (applying but-for standard to the plaintiff's retaliation claims under Title VII and NYSHRL); *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (explaining that temporal proximity alone is not sufficient to establish pretext for a retaliation claim). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 845-46. The determination of whether retaliation is a "but-for" cause or just a motivating factor is "particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts." *Id.* at 846, n.5.

Plaintiff challenges the validity of the counseling memorandum, asserting that unlimited swapping of shifts was permitted under OCSD policy. (Dkt. No. 22, p. 7). She states that "the swapping of shifts leading up to my counseling occurred frequently, and on many occasions were not formally documented in advance." (*Id.*, p. 11). She states that she "had never been counseled for swapping of shifts prior to this." (*Id.*). In addition to this evidence of pretext, a jury could infer pretext from the history of counseling memoranda issued for Plaintiff. The day after

Defendant Devlin learned that Plaintiff had complained to the County Personnel Officer, Gliha, about sexual harassment and discrimination, Plaintiff was issued a counseling form for improperly conducting a shift change by failing to complete a proper head count. (Dkt. No. 19-11, p. 2; Dkt. No. 22, pp. 27-28). Three days later Defendant Devlin issued a letter of counseling telling Plaintiff that her "failure to use [her] chain of command," by reporting to Gliha, violated OCSD policy and procedures and that any further "failure to follow the chain of command could result in departmental charges" for insubordination or misconduct. (Dkt. No. 19-11, p. 2).

A jury could infer retaliatory animus from these memoranda, and in light of all of the circumstances of this case, Plaintiff has raised a triable issue of fact as to whether she would have been immediately suspended or terminated but for her participation in protected activities. Plaintiff has therefore submitted sufficient evidence to overcome summary judgment on her retaliation claims.[18] *See Feingold v. New York*, 366 F.3d 138, 156-57 (2d Cir. 2004) (holding that Plaintiff sufficiently established pretext as to both discrimination and retaliation claims under Title VII where "a reasonable factfinder could determine that . . . other ALJs were not reprimanded or disciplined for similar mistakes").

However, as to Plaintiff's failure to promote claim, Plaintiff has not introduced any evidence at all regarding who, if anyone, was promoted to the full-time position, as discussed above. Given this gap, and the fact that Plaintiff is precluded from challenging the fact that she was insubordinate, there is insufficient evidence from which a jury could infer that she would

_____

[18] Defendants argue: "[P]laintiff was hired with Defendant Devlin's express approval. This strongly weighs against Plaintiff's effort to show retaliatory motive because the 'same actor' inference applies – that is that an individual who hired an employee with knowledge of the employee's protected class is unlikely to have fired the employee out of discriminatory or retaliatory motive." (Dkt. No. 20, p. 17). Even if the "same actor inference" applies to Title VII claims, an inference need not be drawn here because more than three years elapsed between hiring and firing. *Feingold*, 366 F.3d at 154-55; *Thomas v. iStar Financial, Inc.*, 438 F. Supp. 2d 348, 361 (S.D.N.Y. 2006).

have been promoted but for her protected activity. Defendants are therefore entitled to summary judgment on Plaintiff's claim of retaliatory failure to promote.

### D. Hostile Work Environment

Defendants argue in their motion for summary judgment that "to the extent [the] Complaint can be construed to present a claim of hostile work environment harassment, the claim should be dismissed." (Dkt. No. 20, p. 19). Plaintiff does not address Defendants' argument, and did not otherwise expressly assert a hostile work environment claim. (*See* Dkt. No. 22-2). However, a claim for hostile work environment is implied from Plaintiff's allegations in the complaint, as well as her assertion of a discrimination claim arising under Title VII, which can encompass hostile work environment claims. *See Kassner*, 496 F.3d at 240 ("Although the complaint does not explicitly allege discrimination based on a hostile work environment, the complaint alleges 'continued harassment' of Kassner and alleges facts from which we may infer pleading of hostile work environment claims as to her . . . ."). A hostile work environment claim can also arise under the NYSHRL, and the standards for such a claim mirror those for Title VII. *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 256 (S.D.N.Y. 2014); *Bowen-Hooks*, 13 F. Supp. 3d at 233 n.32. *See also Forrest*, 3 N.Y.3d at 310.

A hostile work environment claim requires a showing that: (1) "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "To survive summary judgment on a hostile work environment claim, a plaintiff must first show 'either that a single incident was

45

extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [the plaintiff's] working environment.'" *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) *aff'd,* 629 F.3d 276 (2d Cir. 2010) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000)) (internal punctuation omitted). "Where reasonable jurors could disagree . . . the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004).

The hostile work environment standard "includes both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano*, 294 F.3d at 374). The factors courts consider in evaluating whether a hostile work environment exists include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

To establish a sex-based hostile work environment claim, Plaintiff must demonstrate that the offending conduct occurred because of her sex. *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (quoting *Alfano*, 294 F.3d at 374). "Facially sex-neutral incidents may be

included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Alfano*, 294 F.3d at 378.

Here, while the evidence before the Court is lacking in specifics regarding instances of discriminatory conduct directed toward Plaintiff that are severe enough to meet the standard for a hostile work environment, considering all of the evidence in the light most favorable to Plaintiff it is sufficient to raise a triable issue of fact regarding a hostile work environment. On May 24, 2009, Plaintiff complained of "bullying, harassment, sexual harassment and sexual discrimination" that were "occurring everyday [sic]." (Dkt. No. 22, p. 17).[19] While Undersheriff Allison reported that Plaintiff's concerns were mostly "personality issues with other staff," Plaintiff was sufficiently concerned to go outside the chain of command and next report sexual harassment and discrimination to the County Personnel Officer, Gliha, in April 2010. (Dkt. No. 22, p. 2; Dkt. No. 22, pp. 3-4). As Plaintiff reported to Gliha, and as the Teamsters Local Union President reported to Defendant Devlin in February 15, 2011, unlike male corrections officers (*see* Dkt. No. 22, p. 3), female corrections officers did not have a restroom that they could access without locking in their inmates to take a break. (Dkt. No. 22, p. 21; Dkt. No. 22, p. 88). Within a few days of learning that Plaintiff complained to Gliha, Defendant Devlin issued her a counseling letter chiding Plaintiff for "fail[ing] to follow the chain of command," and noting that any further such incidents "could result in department charges," Dkt. No. 19-11, p. 2), even

---

[19] The Court may consider events that occurred more than 300 days before she filed a charge with the EEOC as part of Plaintiff's hostile work environment claim where, as here, they part of the same hostile work environment practice as acts occurring within the limitations period. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 117-18; *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010).

though the OCSD policy and procedural manual on sexual harassment stated that complaints could be made directly to Gliha. (Dkt. No. 19-7, pp. 3, 6). Further, Plaintiff stated that during firearm re-qualification, other officers made degrading comments, including stating that they were "going to make [her] cry" and making remarks and inquiries regarding classes that both females were attending. (*Id.*, p. 45). Plaintiff thought that the "constant comments" contributed to her inability to qualify. (*Id.*).

Plaintiff has also submitted sworn statements from other female corrections officers complaining about sexual discrimination at OCSD. In her affidavit, Susan Szczepanski states that she was hired in August 2009 and that during her employment she was "repeatedly subject to sexual discrimination." (Dkt. No. 22, p. 77). Szczepanski provided details of specific gender-based discriminatory comments made to her at OCSD. (*Id.*). Plaintiff provided an Otsego County Correctional Facility Information Write-up containing a sworn statement by another female corrections officer complaining about gender-based comments made on September 22, 2009. (Dkt. No. 22, p. 75). *See Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir.2001) ("[W]e recognize that evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination."). Plaintiff also submitted evidence that Defendant Tilbe responded to an incident in which Plaintiff and Szczepanski provided a hot wash cloth to an inmate by "removing the microwave and coffee maker from the female section," reasoning that "apparently they can not [sic] use them appropriately." (*Id.*, p. 40). Considering the above evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has raised a triable issue of fact regarding a hostile work environment.

Furthermore, a basis exists for imputing this conduct to OCSD, as Defendant Devlin, who was in a supervisory position, knew about her complaints of discrimination and allegedly did not take adequate actions to stop the objectionable conduct at issue. *See infra* section IV(F)(2)(a). "Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate action." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

Defendants assert that Devlin took prompt and appropriate actions to respond to Plaintiff's complaints in April 2010 and September 2011. (Dkt. No. 20, p. 22). There is no evidence, however, of any corrective actions taken by Devlin in response to Plaintiff's April 2010 complaints to the County Personnel Officer. (*See* Dkt. No. 19-11, p. 2). In fact, some of the same complaints Plaintiff made in May 2009 and April 2010 regarding sexual harassment and inferior facilities for women were also later made by the union representative in her February 15, 2011 letter to Devlin. (Dkt. No. 22, pp. 87-88). There is no evidence of any response by Devlin to the allegations in the February 15, 2011 letter that the part-time corrections officers were "subject to a pervasive, hostile work environment based upon their gender." (*Id.*, p. 88). Thus, there is at least an issue of fact as to whether Devlin's responses to those complaints were appropriate, particularly in light of evidence that discrimination and harassment persisted after Devlin responded to Plaintiff's May 2009 complaint. *See Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (holding that the plaintiff "presented sufficient evidence to withstand

summary judgment with respect to the second element of her hostile work environment claim" where, after she complained to her supervisor regarding harassment, "[t]he Town took five weeks to mete out any discipline whatever," and ultimately "issued a two-day suspension and merely 'recommended' that Holdsworth apologize to Howley and to the firefighter group"); *cf. Godineaux v. LaGuardia Airport Marriot Hotel*, 460 F. Supp. 2d 413, 423 (E.D.N.Y. 2006) (holding that employer was not vicariously liable for alleged harassment by coworker when, after the plaintiff complained to his supervisor, the supervisor "immediately sent him to . . . human resources, who investigated the matter pursuant to [the employer's] written Sexual Harassment Policy, and issued a warning to [the coworker] in addition to a copy of the policy," and where the coworker's "behavior stopped" after the plaintiff complained). Thus, Plaintiff has submitted sufficient evidence to overcome summary judgment for her hostile work environment claim.

### E.      Intentional Infliction of Emotional Distress

In the complaint, Plaintiff asserted that "defendants intentionally inflicted [e]motional harm upon" her. (Dkt. No. 1, p. 12). In New York, a one year statute of limitations applies to the cause of action for intentional infliction of emotional distress. *Misek-Falkoff v. Int'l Bus. Machines Corp.*, 162 A.D.2d 211, 211, 556 N.Y.S.2d 331, 331 (1st Dep't 1990) (citing *Gallagher v. Dirs. Guild of Am., Inc.*, 144 A.D.2d 261, 263, 533 N.Y.S.2d 863, 865 (1st Dep't 1988)). Defendants argue that Plaintiff's claim must be dismissed because it is time-barred; Plaintiff was terminated on February 22, 2012, and she filed this action on December 30, 2013. (Dkt. No. 20, p. 23; *see also* Dkt. No. 1, p. 1; Dkt. No. 19-15, ¶ 59; Dkt. No. 22-1, ¶ 59). Plaintiff did not respond to this argument or otherwise defend this claim in her response to the motions for summary judgment. (*See* Dkt. No. 22-2, p. 27). The Court agrees with Defendants; Plaintiff's

claim for intentional infliction of emotional distress is barred by the statute of limitations set forth at N.Y. C.P.L.R. § 215.

### F.     Liability of Individual Defendants

Plaintiff has asserted causes of action against the individual defendants under the NYSHRL, § 1983, and Article 1, Section 11 of the New York State Constitution. (Dkt. No. 1, p. 11). Individual employees may be liable for aiding and abetting discriminatory practices under New York Executive Law § 296(6). *See Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010). Furthermore, the individual defendants may be held liable for violations of Plaintiff's right to equal protection under 42 U.S.C. § 1983. *Demoret*, 451 F.3d at 149.

### 1.     Pierce, Tilbe, and Ellwanger's Status as Defendants

Pierce, Tilbe, and Ellwanger argue, as an initial matter, that they are not defendants, as they were not named in the caption of this case and were not served with summonses.[20] (Dkt. No. 23, p. 5). It is undisputed that Plaintiff did not name them in the first paragraph of her complaint, where she summarized her claims, and did not request any compensatory relief as against those three individuals, and that they were never served with summonses or copies of the complaint. (Dkt. No. 23, pp. 4-5). As Defendants point out (*id.*, p. 5), on April 4, 2014 an initial pretrial conference in this matter took place before United States Magistrate Judge David E. Peebles, at which time Plaintiff was given the opportunity to amend the complaint. (Dkt. Entry dated 4/4/2014). Plaintiff never filed a motion to amend or an amended complaint.

---

[20] The summonses were issued when Plaintiff was proceeding pro se; the docket does not reflect any summonses issued as to Pierce, Tilbe, and Ellwanger. (Dkt. No. 3).

Despite the fact that Pierce, Tilbe, and Ellwanger were not named in certain portions of the complaint, including the caption, their names do appear as defendants in the body of the complaint. (*See* Dkt. No. 1, pp. 4-5, 9-10). Defendants' answer states that it is filed on behalf of "The Defendants, Otsego County Sheriff's Department, Sheriff Richard Devlin, Jr., Lieutenant Donald Lincourt, *Lieutenant Adam Pierce, Sergeant Adam Tileb [sic] and Sergeant Michael Ellwanger*, individually and in their official capacities." (Dkt. No. 7, p. 1 (emphasis added)). J. Ryan Hatch and Frank W. Miller both filed notices of appearance as Defendants' counsel on March 4, 2014 stating that they represented "Adam Pierce, Adam Tileb [sic], and Michael Ellwanger," as well as the named Defendants. (Dkt. No. 5, p. 1; Dkt. No. 6, p. 1). However, when William J. Hathaway joined the case as Defendants' counsel on March 5, 2015, he stated in his notice of appearance that he represented only the three named defendants, and did not mention Pierce, Tilbe, or Ellwanger. (Dkt. No. 18, p. 1). When Defendants filed their motion for summary judgment that same day, they wrote that the motion was filed on behalf of the three named defendants only. (Dkt. No. 19, p. 1). In their memorandum of law in support of the motion for summary judgment, Defendants stated in a footnote that their "position" was "that neither Officer Tilbe nor Officer Ellwanger nor Officer Pierce is a defendant in this litigation." (Dkt. No. 20, p. 20, n.1).[21] Defendants assert that "the omission of Pierce, Tilbe, and Ellwanger as formal movants on the original Motion for Summary Judgment was due to a good faith belief that they are not parties to this action in accordance with the pleadings, lack of service upon them, and applicable Court rules." (Dkt. No. 24-3, p. 5). To date, Plaintiff has not moved for an

---

[21] Plaintiff argues that Pierce, Tilbe, and Ellwanger should be considered defendants in this case because they were identified in the body of the complaint, and Defendants' counsel appeared and answered the complaint on their behalf. (*See* Dkt. Nos. 5-7).

extension of time to serve Pierce, Tilbe, and Ellwanger, and Defendants did not file a separate motion asking for an order as to whether Pierce, Tilbe, and Ellwanger are parties to the case.

### a. Effect of Failure to Include Names in Caption

Rule 10 of the Federal Rules of Civil Procedure states that "[t]he title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). "The purpose of Rule 10(a) is to provide clear notice as to the parties in an action. However, the caption itself is normally not determinative of the identity of the parties or of the pleader's statement of claim." *City of Syracuse v. Loomis Armored US, LLC*, No. 5:11-cv-007744 (MAD/GHL), 2011 WL 6318370, at *3, 2011 U.S. Dist. LEXIS 144530, at *7-8 (N.D.N.Y. Dec. 15, 2011) (internal quotation marks and citations omitted). In determining whether an entity is a party to a lawsuit, courts consider "[t]he caption, pleadings, service of process and other indications of the intent of the pleader." *Id.* (quoting *E.E.O.C. v. Int'l Ass'n of Bridge, Structural, & Ornamental Ironworkers, Local 580*, 139 F. Supp. 2d 512, 525 (S.D.N.Y. 2001)). The fact that the party in question was "mentioned throughout the body of the complaint" is relevant to this determination. *See id.* ("In the present matter, although Plaintiff failed to include AMSA in the complaint's caption, AMSA is mentioned throughout the body of the complaint.").

"[C]ourts have found pro se complaints to sufficiently plead claims against defendants not named in the caption when there are adequate factual allegations to establish that the plaintiff intended them as defendants." *JCG v. Ercole*, No. 11 Civ. 6844(CM)(JLC), 2014 WL 1630815, at *16, 2014 U.S. Dist. LEXIS 57417, at *61 (S.D.N.Y. Apr. 24, 2014) (citing, *inter alia*, *Ocasio v. Riverbay Corp.*, No. 06 Civ. 6455(PAC) (KNF), 2007 WL 1771770, at *7, 2006 U.S. Dist. LEXIS 93104, at *16 (S.D.N.Y. Dec. 20, 2006), *report recommendation adopted*, 2007 WL

53

1771770, 2007 U.S. Dist. LEXIS 44751 (S.D.N.Y. June 19, 2007); *Gibson v. Brown*, No. 12 Civ.

622(KAM)(RLM), 2012 WL 1744845, at *1 n.2, 2012 U.S. Dist. LEXIS 68669, at *1 n.2

(E.D.N.Y. May 16, 2012); *O'Neal v. Cnty. of Nassau*, 992 F. Supp. 524, 531 (E.D.N.Y.1997);

*Trackwell v. U.S. Gov't.*, 472 F.3d 1242, 1243–44 (10th Cir. 2007)). Courts' treatment of pro se

complaints that fail to comply with Rule 10(a) is consistent with the Supreme Court's statement

that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however

inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by

lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citations

omitted). Notably, here Plaintiff filed the complaint pro se, but came to be represented by

counsel less than three months later. (*See* Dkt. Nos. 1, 9). The Court granted Plaintiff leave to file

a motion to amend after Plaintiff's counsel appeared in the case (Dkt. Entry dated April 4, 2014),

but Plaintiff never filed a motion to amend or otherwise attempted to amend the complaint.

Nonetheless, Plaintiff's complaint is entitled to a liberal construction in light of her pro se status

at the time of filing. *See Marchand v. Simonson*, 16 F. Supp. 3d 97, 116 (D. Conn. 2014). Thus,

Plaintiff's failure to name Pierce, Tilbe, and Ellwanger in the caption of the complaint does not

render them non-parties to this action.

> **b.    Effect of Failure to Include Names in Summary of Claims or Request for Compensatory Damages**

Defendants point out that in the first paragraph of Plaintiff's complaint, she states that she

"[s]eeks redress against her employer, the OCSD, Sheriff Richard Devlin, Jr. and Lieutenant

Donald Lincourt in their individual and official capacities," but makes no mention of Pierce,

Tilbe, or Ellwanger. (Dkt. No. 23, p. 4; *see also* Dkt. No. 1, p. 1). Furthermore, Defendants note

that Plaintiff's complaint states that she seeks "compensatory damages" against OCSD, Devlin,

and Lincourt only, and does not request compensatory relief against Pierce, Tilbe, or Ellwanger. (Dkt. No. 23, p. 4 n.1; *see also* Dkt. No. 1, p. 12). These arguments can be quickly disposed of in light of the liberal pro se pleading standard. *See Erickson*, 551 U.S. at 94. Here, Plaintiff listed Pierce, Tilbe, and Ellwanger as defendants in the body of the complaint, in a section titled "Parties," and specific allegations regarding each of them appear throughout the complaint. (*See* Dkt. No. 1, pp. 4-5, 9-10). This is sufficient to indicate Plaintiff's intent to include each of them as defendants in the case.

### c.     Effect of Failure to Serve

Defendants argue that Pierce, Tilbe, and Ellwanger are not parties to this case because Plaintiff did not serve them as required under the Federal Rules of Civil Procedure. (Dkt. No. 23, p. 5). Under Rule 4(m) of the Federal Rules, "[i]f a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m). However, "[a] defense of insufficiency of process is waived if it is not promptly asserted by motion or in the responsive pleading." *Ahern v. Neve*, 285 F. Supp. 2d 317, 321 (E.D.N.Y. 2003) (citing Fed. R. Civ. P. 12(h)(1); *Santos v. State Farm Fire & Casualty Co.*, 902 F.2d 1092, 1095 (2d Cir. 1990)). Here, Defendants filed an answer on behalf of Pierce, Tilbe, and Ellwanger, and did not raise the lack of service as an affirmative defense. (*See* Dkt. No. 7, pp. 6-8). Further, counsel appeared on their behalf on March 4, 2014, indicating that they had notice of the proceeding and were active participants in the case no later than that date. *See Fed. Home Loan Mortg. Corp. v. Dutch Lane Assocs.*, 775 F. Supp. 133, 137 (S.D.N.Y. 1991) (stating

that it was "clear" that defendants had "actual notice of the proceedings" where they "interposed an answer without suffering any prejudice from alleged defects in the service of process and then proceeded to enter into seven months of settlement negotiations"). Nonetheless, Defendants did not raise the lack of service as an issue until they moved for summary judgment on March 5, 2015, more than a year after they filed their answer and two notices of appearance. (Dkt. Nos. 5-7, 19). Because Defendants failed to timely assert lack of service, the defense is deemed waived under Rules 12(b)(5) and 12(h)(1)(B)(ii). *See* Fed. R. Civ. P. 12(b)(5) (requiring that motion to assert the defense of insufficient process be made "before pleading if a responsive pleading is allowed"); Fed. R. Civ. P. 12(h)(1)(B)(ii) (stating that certain defenses, including insufficient process, are waived when a party fails to include the defense "in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course"). *See also Love v. Riverhead Cent. Sch. Dist.*, 823 F. Supp. 2d 193, 197 (E.D.N.Y. 2011) ("A defense of insufficiency of process is waived if it not promptly asserted by motion or in the responsive pleading."); *Seward & Kissel v. Smith Wilson Co., Inc.*, 814 F. Supp. 370, 374 (S.D.N.Y. 1993) (deeming insufficient process defense waived where the defendant "did not raise a service of process defense pursuant to Rule 12 in [its] answer" and "[m]oreover, . . . did not even raise a personal jurisdiction defense that might arguably have preserved such a motion").

In addition, principles of fairness weigh against excluding Pierce, Tilbe, and Ellwanger from the case at this late stage in the proceedings. "Allowing parties to actively engage in the judicial process yet delay in raising issues of technical defects in the proper form of service of process that could have been easily cured early on makes little sense and merely wastes precious judicial time and resources." *Id.* Moreover, excluding these three individuals as defendants now

would deprive Plaintiff of any opportunity to obtain relief from them, as the statutes of limitations for each of her claims at issue, (Title VII, NYSHRL, and 42 U.S.C. § 1983), have long since run out. *See Owens v. Okure*, 488 U.S. 235, 251 (1989); *Kassner*, 496 F.3d at 238; N.Y. C.P.L.R. § 214; 42 U.S.C. § 2000e-5(e)(1). "A defendant cannot justly be allowed to lie in wait, masking by misnomer its contention that service of process has been insufficient, and then obtain dismissal on that ground only after the statute of limitations has run, thereby depriving the plaintiff of the opportunity to cure the service defect." *Santos*, 902 F.2d at 1095. For these reasons, the Court concludes that Pierce, Tilbe, and Ellwanger are proper defendants in this action.

### 2. Liability under NYSHRL

An individual can be held liable under N.Y. Executive Law § 296(1) as an "employer" if "he has (1) an 'ownership interest' in the company or (2) 'any power to do more than carry out personnel decisions made by others.'" *Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303 (KAM)(JMA), 2013 WL 1316712, at *20, 2013 U.S. Dist. LEXIS 45346, at *66-67 (E.D.N.Y. Mar. 28, 2013) (quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659 (1984)). "The four factors a court may consider under the second prong of the *Patrowich* test include whether the individual had the authority to hire and fire employees, supervised and controlled employee work schedules or employment conditions, determined payment rate and method, and maintained employment records." *Id.*, 2013 WL 1316712, at *20, 2013 U.S. Dist. LEXIS 45346, at *67 (citations omitted).

"In addition, the NYSHRL states that it shall be an unlawful discriminatory practice 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this

article, or attempt to do so.'" *Feingold*, 366 F.3d at 157 (quoting N.Y. Exec. Law § 296(6)). The Second Circuit has held that "a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' [can] be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff." *Id.* (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995). *See also Conklin v. Cnty. of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012) ("[A] defendant may be held liable for aiding and abetting allegedly unlawful discrimination by her employer where her actions serve as the predicate for the employer's vicarious liability."); *Pellegrini*, 740 F. Supp. 2d at 356 ("In general, an aider and abettor is one 'who actually participates in the conduct giving rise to a discrimination claim.'") (quoting *Tomka*, 66 F.3d at 1317).

### a. Devlin

Here, Defendant Devlin can be held liable as an "employer" under the NYSHRL as to Plaintiff's claims for discrimination, retaliation, and hostile work environment. It is undisputed that he had the authority to both hire and fire Plaintiff. (Dkt. No. 19-15, ¶¶ 7, 59; Dkt. No. 22-1, ¶¶ 7, 59). *See Feingold*, 366 F.3d at 157 ("A supervisor is an 'employer' for purposes of establishing liability under the NYSHRL if that supervisor 'actually participates in the conduct giving rise to the discrimination.'") (quoting *Tomka*, 66 F.3d at 1317).[22] This is sufficient to establish that Plaintiff's claims against Devlin can go forward under N.Y. Executive Law § 296(1). *Pellegrini*, 740 F. Supp. 2d at 355-56. *See also E.E.O.C. v. Suffolk Laundry Servs., Inc.*,

---

[22] *See also Miloscia v. B.R. Guest Holdings LLC*, 33 Misc.3d 466, 478, 928 N.Y.S.2d 905, 916 (N.Y. Sup. Ct. 2011) ("[U]nder the NYSHRL, an individual employee may be liable as an 'employer' only when she has an 'ownership interest or any power to do more than carry out personnel decisions made by others.'").

48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014); *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 554 (S.D.N.Y. 2014).

Alternatively, Devlin can be held liable under the NYSHRL as an aider and abettor as to each of the claims. As to the discrimination claim, "'[a] supervisor's failure to take adequate remedial measures' in response to a complaint of discrimination has been deemed 'actual participation' under NYSHRL § 296(6)." *Parra*, 48 F. Supp. 3d at 555 (quoting *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 3d 376, 381 (S.D.N.Y. 1999)). The same principle applies to Plaintiff's hostile work environment claim, as Devlin allegedly was aware of the pervasive environment of discrimination and harassment within the OCSD and failed to take appropriate actions in response. *See supra* section IV(D). And as to Plaintiff's retaliation claim, Devlin was involved in the actions underlying that claim because he received Plaintiff's complaints of discrimination, and made the decisions to suspend and then terminate her, allegedly in retaliation for Plaintiff's participation in protected activities. *See Steadman v. Sinclair*, 223 A.D.2d 392 , 393, 636 N.Y.S.2d 235 (1st Dep't 1996) (recognizing claim for aiding and abetting liability based on retaliation), *recognized by Fiacco v. Christie's Inc.*, No. 00-CV-526LEKDRH, 2002 WL 257693, at *2, 2002 U.S. Dist. LEXIS 2795, at *9 (N.D.N.Y. Feb. 21, 2002).

### b.    Lincourt

The record indicates that Defendant Lincourt "hired the Plaintiff subject to approval by Defendant Devlin." (Dkt. No. 19-15, ¶ 7; Dkt. No. 22-1, ¶ 7). This is not a sufficient basis upon which to hold Lincourt liable as an "employer" under the NYSHRL. *See Petrisch*, 2013 WL 1316712, at *21, 2013 U.S. Dist. LEXIS 45346, at *68 (holding that the defendant was not liable

as an employer where he "had no authority to hire and fire employees without the review of HSBC's Human Resources Department").

Plaintiff has also failed to raise a triable issue of fact showing that Lincourt "aided and abetted" violations of the NYSHRL under any of Plaintiff's asserted theories. Plaintiff has submitted evidence showing that Lincourt met with Plaintiff on October 13, 2011 to discuss the shift-swapping counseling memorandum; at that meeting, Plaintiff was allegedly told that the matter of which employees were allowed to participate in an armed transport was "above [her] paygrade." (Dkt. No. 22, pp. 7-8). Plaintiff, however, has not introduced any evidence that Lincourt participated in any of the conduct underlying Plaintiff's claims; there is no evidence that he was involved in her suspension or termination. Plaintiff testified at her deposition that she was "unsure" whether Lincourt ever made any "sexual remarks to her," and stated that she "believe[d]" that he had made "discriminatory" remarks to her but could not recall when, or what the remarks were. (Dkt. No. 19-14, p. 12). This is insufficient to establish Lincourt's individual liability as to Plaintiff's claims for either gender discrimination or hostile work environment.

Nor is there any indication in the record that Lincourt aided and abetted in retaliating against Plaintiff. There is no evidence that Lincourt was aware of her internal complaints of discrimination, or that he participated in the allegedly retaliatory decisions to suspend and later terminate her employment. *See Carter v. City of Syracuse*, No. 5:10-CV-690 (FJS/TWD), 2012 WL 930798, at *10, 2012 U.S. Dist. LEXIS 36612, at *35-36 (N.D.N.Y. Mar. 19, 2012) ("The Court finds that Plaintiff has not alleged facts that make out a plausible retaliation claim against Defendants . . . because she does not even indicate that they were personally involved in, or that

60

they aided and abetted, unlawful retaliation."). Thus, the Court will grant summary judgment as to Plaintiff's NYSHRL claims against Lincourt.

### c.    Pierce

There is no indication in the record that Defendant Pierce had power to hire and fire employees, supervise schedules or employment conditions, determine payment rate or method, or maintain employment records. Thus, he is not subject to liability as an "employer" under N.Y. Exec. Law § 296(1). Nor is he subject to liability as an aider and abettor under N.Y. Exec. Law § 296(6). Plaintiff testified that she cannot recall Pierce ever having made discriminatory remarks to her. (Dkt. No. 26-2, p. 5). Nor did she ever overhear Defendant Pierce make any remarks of a discriminatory or sexual nature. (Dkt. No. 19-15, p. 4; Dkt. No. 22-1, p. 3). The record shows that Pierce emailed Plaintiff stating that she was required to participate in cross-training (Dkt. No. 22, p. 2) and also sent an email to others including Tilbe and Devlin stating that employees who had failed to requalify with a firearm, including Plaintiff, were "not currently authorized to perform 'armed' assignments." (*Id.*, p. 47). There is no evidence that he participated in the conduct underlying Plaintiff's claims and no evidence of any discriminatory intent or intent to retaliate against Plaintiff for her participation in protected activities. Thus, the evidence in the record does not provide a basis for finding that Pierce aided and abetted in the conduct giving rise to Plaintiff's claims for discrimination, retaliation, or hostile work environment, and the Court will grant summary judgment as to Plaintiff's NYSHRL claims against Defendant Pierce.

### d.    Tilbe

Defendant Tilbe gave Plaintiff a performance evaluation in December 2010, with ratings of satisfactory or improving, but told her to work on her "negative attitude." (Dkt. No. 22, p. 4,

34-36). In February 2011, Tilbe sent an email to Pierce and Lincourt stating that he would "remove[] the microwave and coffee maker from the female section" in response to Plaintiff's having provided an inmate with a hot washcloth (*id.*, p. 40), and on October 13, 2011, he gave Plaintiff an order to go on an armed transport, which she refused (*id.*, pp. 7-8). Plaintiff testified that she "believe[d]" Tilbe had made "discriminatory remarks" to her, but could not recall the substance of the remarks or when they were made. (Dkt. No. 19-4, pp. 15-16).

There is no basis for a retaliation claim against Tilbe for removing the microwave and coffee maker.[23] While removing the coffee pot and microwave may be sufficient to constitute an adverse action for a retaliation claim, Plaintiff has failed to introduce any evidence that Tilbe was aware of Plaintiff's having engaged in protected activities, or of any retaliatory animus by Tilbe. Because no reasonable jury could conclude that Tilbe aided and abetted in any of the conduct giving rise to Plaintiff's NYSHRL claims, the Court will grant summary judgment as to Plaintiff's NYSHRL claims against him.

### e. Ellwanger

Defendant Ellwanger issued a counseling memorandum to Plaintiff on July 25, 2011 for leaving her post without notifying a supervisor. (Dkt. No. 22, p. 42). He also issued a counseling memorandum to Plaintiff on October 9, 2011 regarding her unauthorized swapping of shifts. (Dkt. No. 19-9, p. 2). Plaintiff alleges that Ellwanger told her that she "could not conduct armed

---

[23] While Tilbe's statement that he would remove "the microwave and coffee maker from the female section as apparently they can not [sic] use them appropriately" might be viewed as indicating a lack of respect for the female corrections officers, this action is, as described above, not an adverse action for a discrimination claim.

assignments" after she failed to requalify for use of a firearm. (Dkt. No. 22, p. 7). Plaintiff has not submitted any evidence indicating that Ellwanger made discriminatory statements to her.[24]

The evidence that Plaintiff has submitted as to Defendant Ellwanger is not sufficient to raise a triable issue of fact as to whether he aided and abetted his employer in conduct giving rise to any of Plaintiff's claims under the NYSHRL. Plaintiff has not submitted evidence showing that Ellwanger participated in discrimination or the creation of a hostile work environment. Although he issued a counseling memorandum to Plaintiff shortly after she complained of the behavior at the firing range, Plaintiff has not submitted evidence showing that he was aware of her complaint or acted with retaliatory animus. Thus, Ellwanger is entitled to summary judgment as to Plaintiff's NYSHRL claims.

### 3.     Equal Protection

Plaintiff's Section 1983 claim and her New York State Constitutional claim are both founded on her right to equal protection. (Dkt. No. 1, p. 11).[25] For the reasons that follow, the Court grants summary judgment in favor of all Defendants as to the New York State Constitution claim, and grants summary judgment in favor of Defendants Lincourt, Pierce, Tilbe and Ellwanger as to the Section 1983 claim, but denies summary judgment as to Defendants OCSD and Devlin as to the Section 1983 claim.[26]

---

[24] Defendants state that Plaintiff testified at her deposition that she "could not recall when or where [Ellwanger] made any discriminatory remarks to her" (Dkt. No. 26-2, p. 5), but cite to testimony that they have failed to provide. (*See id.* (citing page 50 of the deposition); Dkt. No. 19-4, pp. 16-17 (skipping from page 49 to page 52 of deposition transcript)).

[25] *See Patterson*, 375 F.3d at 225. Article 1, § 11 of the New York State Constitution states in part: "No person shall be denied the equal protection of the laws of this state or any subdivision thereof."

[26] Neither party has briefed whether Defendant OCSD may be held liable under 42 U.S.C. § 1983, and the Court does not address that issue here. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).

### a. Section 1983

"In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004). Here, Defendants do not dispute that they acted under color of state law. "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII." *Demoret*, 451 F.3d at 149 (2d Cir. 2006).[27] *See also Feingold*, 366 F.3d at 159 ("Once action under color of state law is established, Feingold's equal protection claim parallels his Title VII claim."); *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 577 (S.D.N.Y. 2013) ("In the Second Circuit, employment discrimination claims brought under the Equal Protection Clause are analyzed under the same three-step *McDonnell Douglas* test for claims brought pursuant to Title VII of the Civil Rights Act of 1964.").[28] As stated above, Plaintiff has submitted sufficient evidence to overcome summary judgment under the *McDonnell Douglas* test. *See supra* sections IV(B)-(D).[29]

---

[27] Plaintiff's claims under §1983 are subject to a three-year statute of limitations. *Vega*, 801 F.3d at 79. The statute of limitations, however, is an affirmative defense. *Ellis v. Wilkinson*, 81 F. Supp. 3d 229, 234 (E.D.N.Y. 2015). Although Defendants asserted a statute of limitations defense generally in their answer to the complaint (Dkt. No. 7), they did not raise the defense in connection with the motion for summary judgment.

[28] "A § 1983 action may not . . . be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII." *Patterson*, 375 F.3d at 225. However, Plaintiff's § 1983 claim differs from her Title VII claims because "a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Demoret*, 451 F.3d at 149. Thus, Plaintiff may be able to use her § 1983 claim to recover against the individual Defendants, who are not subject to liability under Title VII.

[29] "[A] claim of retaliation for a complaint that alleged discrimination is actionable under § 1983." *Vega*, 801 F.3d at 81. Section 1983 also covers claims for both hostile work environment and gender discrimination. *Demoret*, 451 F.3d at 149.

Personal involvement of the individual defendants "in alleged constitutional deprivations is a prerequisite to an award of damages under §1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Defendant Devlin was personally involved for purposes of Plaintiff's § 1983 claim, while Defendants Lincourt, Pierce, Tilbe, and Ellwanger were not, for the reasons stated above. *See Feingold*, 366 F.3d at 159 ("We have earlier found that Feingold has presented sufficient evidence to permit the conclusion that all of the named individual defendants were personally involved in behavior unlawful under the NYSHRL. . . . He has also, therefore, presented sufficient evidence to permit the conclusion that they were personally involved in behavior that violates Section 1983."). *See also Kennedy v. New York*, __ F. Supp. 3d __, No. 14-CV-990S, 2016 WL 850910, at *9, 2016 U.S. Dist. LEXIS 28265, at *27-28 (W.D.N.Y. Mar. 4, 2016) ("Having found that Kennedy has not pled that Silver had 'personal involvement' under her § 1983 claim, this court finds that Kennedy's NYSHRL claim fails on similar grounds.") (citing *Stevens v. New York*, 691 F. Supp. 2d 392, 401 (S.D.N.Y. 2009)); *Westbrook v. City Univ. of N.Y.*, 591 F. Supp. 2d 207, 224 (E.D.N.Y. 2008) (analyzing "personal involvement" of the defendant for purposes of § 1983 claim along with "actual participation" in conduct giving rise to discrimination for purposes of NYSHRL claim).

Thus, Defendants' motion for summary judgment as to Plaintiff's Section 1983 Equal Protection claim is granted as to Defendants Lincourt, Pierce, Tilbe and Ellwanger, and denied as to Defendants OCSD and Devlin.[30]

---

[30] Defendants argue that both Plaintiff's Equal Protection claim and her claim under the State Constitution fail because Plaintiff has not presented any evidence showing that "she was intentionally treated differently from other individuals similarly situated and that there is no rational basis for the difference." (Dkt. No. 20, p. 19 (citing

### b. Article 1, § 11 of New York State Constitution

New York recognizes a private cause of action for violations of Article 1, § 11 of the New York State Constitution. *Brown v. State*, 89 N.Y.2d 172, 192, 652 N.Y.S.2d 223, 235 (1996). That cause of action is only available, however, "where the plaintiffs have no alternative remedies that would protect their interests." *Vilkhu v. City of New York*, No. 06-CV-2095 (CPS)(JO), 2008 WL 1991099, at *8, 2008 U.S. Dist. LEXIS 36454, at*25 (E.D.N.Y. May 5, 2008) (citing, *inter alia*, *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628-29 (S.D.N.Y. 1999), *aff'd*, 234 F.3d 1261 (2d Cir. 2000) (unpublished); *Bath Petroleum Storage Inc. v. Sovas*, 136 F. Supp. 2d 52, 58 (N.D.N.Y. 2001); *Muhammad v. N.Y.C. Transit Auth.*, 450 F. Supp. 2d 198, 212 (E.D.N.Y. 2006)). Thus, because Plaintiff has a viable claim under Section 1983, the Court grants Defendants' motion for summary judgment as to Plaintiff's claim under the New York State Constitution.

To the extent that Defendants Lincourt, Pierce, Tilbe, and Ellwanger may be subject to liability under Article 1, § 11 of the New York State Constitution in the absence of liability under 42 U.S.C. § 1983, such a claim against them would fail for the same reasons the § 1983 claim does. *See Febres v. City of New York*, 238 F.R.D. 377, 392 (S.D.N.Y. 2006) ("The New York State Constitution's guarantees of equal protection . . . are virtually coextensive with those of the federal Constitution.") (citing *Coakley*, 49 F. Supp. 2d at 628).

---

*Ferguson v. City of Rochester Sch. Dist.*, 485 F. Supp. 2d 256 (W.D.N.Y. 2007)). Defendants' argument is based on the standard applicable to a "class of one" equal protection claim. *See Ferguson*, 485 F. Supp. 2d at 259; *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Here, Plaintiff alleges discrimination on the basis of gender in violation of the equal protection clause, and thus the "class of one" standard does not apply.

## V.    CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 19) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 19) is **GRANTED** as to Plaintiff's claim for violation of Article 1, § 11 of the New York State Constitution (Sixth Cause of Action); and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 19) is **GRANTED** as to Plaintiff's claim for intentional infliction of emotional distress (Seventh Cause of Action); and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 19) is **GRANTED** as to Plaintiff's claims of discrimination and retaliation in connection with the failure to promote her to a full-time position; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 19) is **GRANTED** as to Plaintiff's claims against Defendant Lincourt; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 19) is otherwise **DENIED**; and it is further

**ORDERED** that the Motion for Summary Judgment filed by Defendants Pierce, Tilbe and Ellwanger (Dkt. No. 26) is **GRANTED;** and it is further

**ORDERED** that Defendants Lincourt, Pierce, Tilbe and Ellwanger are **DISMISSED** from this action.

**IT IS SO ORDERED.**

Brenda K. Sannes
U.S. District Judge

April 14, 2016
Syracuse, New York